300 F.3d 1037
 Arthur L. McDONALD; Rita McDonald; Karla McDonald; Justin D. McDonald, Plaintiffs,
v.
Patti MEANS; Kale Means, Defendants,
The Northern Cheyenne Tribe, Intervenor-Appellant,
v.
USDC-Billings, Appellee.
Arthur L. McDonald; Rita McDonald; Karla McDonald; Justin D. McDonald, Plaintiffs-Appellees,
v.
Patti Means; Kale Means, Defendants-Appellants.
 No. 99-36166.
 No. 00-35002.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 6, 2001.
 Filed August 14, 2002.
 
 COPYRIGHT MATERIAL OMITTED Steven A. Kelly, Lame Deer, MT, for the intervenor-appellant.
 Clarence Belue, Billings, MT, for the defendants-appellants.
 Gregory G. Murphy, Moulton, Bellingham, Longo & Mather, P.C., Billings, MT, for the plaintiffs-appellees.
 Appeal from the United States District Court for the District of Montana; Jack D. Shanstrom, District Judge, Presiding. D.C. No. CV-99-00064-JDS.
 Before: BROWNING, WALLACE and T.G. NELSON, Circuit Judges.
 BROWNING, Circuit Judge.
 
 
 1
 This case arises from an accident on Route 5, a Bureau of Indian Affairs ("BIA") road within the Northern Cheyenne Indian Reservation in Big Horn County, Montana. On the evening of May 2, 1998, Kale Means, a member of the Cheyenne Tribe and a minor, was seriously injured when his car struck a horse that had wandered onto Route 5. The horse belonged to Arthur L. McDonald, who operated a quarter horse ranching operation on land he owns in fee within the exterior boundaries of the Northern Cheyenne Reservation. Mr. McDonald is an enrolled member of the Ogalala Sioux Tribe, but he is not a member of the Northern Cheyenne Tribe.
 
 
 2
 On March 4, 1999, Patti Means, guardian for Kale Means, brought a civil action against Arthur McDonald and his family in the Northern Cheyenne Tribal Court, alleging McDonald was negligent in allowing his horse to trespass onto Route 5. The McDonalds filed suit in the United States district court for the district of Montana, challenging the tribal court's jurisdiction over the dispute. The district court rejected the Tribe's motion to intervene and held that the tribal court lacked jurisdiction, granting summary judgment for the McDonalds and enjoining Means from pursuing his action in tribal court. Means appeals the district court's grant of summary judgment, and we reverse. The Tribe appeals the denial of their motion to intervene, and we affirm.
 
 DISCUSSION
 1. Tribal Jurisdiction[1]
 
 3
 Tribes maintain broad authority over the conduct of both tribal members and nonmembers on Indian land, or land held in trust for a tribe by the United States. Strate v. A-1 Contractors, 520 U.S. 438, 454, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997); Williams v. Lee, 358 U.S. 217, 222, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). We presume that tribal courts maintain civil jurisdiction over the activities of non-Indians on tribal land unless affirmatively limited by federal law. Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). However, in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court held that a tribal court lacks authority over the conduct of nonmembers on land within a reservation that is owned in fee by a non-Indian.[2] Id. at 565-66, 101 S.Ct. 1245.
 
 
 4
 Strate v. A-1 Contractors addressed tribal court jurisdiction over a suit arising from an accident on a state highway that ran through the Fort Berthold Indian Reservation in North Dakota. 520 U.S. at 442, 117 S.Ct. 1404. The Court held that by granting North Dakota a right-of-way to maintain the highway, the Tribe had, in effect, alienated the land to a non-member, and that the general rule in Montana thus applied to bar civil jurisdiction over the suit. Id. at 456, 117 S.Ct. 1404. The Strate Court reserved the question of civil jurisdiction over nonmember conduct on tribal roads. Id. at 442, 117 S.Ct. 1404.
 
 
 5
 The district court rejected tribal jurisdiction because it equated Route 5 with the state highway held in Strate to constitute alienated non-Indian land governed by the rule in Montana. Means argues that Route 5 is in fact a tribal road exempted from the Strate analysis, and that the Tribe retained an interest in the road sufficient to survive the Montana rule barring tribal jurisdiction. The primary issue in this case is thus whether BIA roads, like the state highway considered in Strate, are non-Indian fee land subject to the Montana rule. We conclude that BIA roads constitute tribal roads not subject to Strate, and that the BIA right-of-way did not extinguish the Tribe's gatekeeping rights to the extent necessary to bar tribal court jurisdiction under Montana.
 
 
 6
 A. Route 5 is a "tribal road" not governed by Strate.
 
 
 7
 Strate held that a tribal court may not hear civil claims against nonmembers arising from accidents on a state highway that crosses a reservation, because the tribe had relinquished all gatekeeping rights over the highway right-of-way. Strate, 520 U.S. at 455-456, 117 S.Ct. 1404. However, the Court qualified that holding by noting that it "express[ed] no view on the governing law or proper forum when an accident occurs on a tribal road within a reservation." Id. at 442, 117 S.Ct. 1535. We conclude that Route 5, as a BIA road, is a tribal road expressly reserved from the rule in Strate.
 
 
 8
 Title 25, Part 170 of the Code of Federal Regulations ("Roads of the Bureau of Indian Affairs") makes clear that a BIA road is considered an "Indian reservation road," 25 C.F.R. § 170.1. This is so even where a road serves both Indian and non-Indian land, see id. at § 170.7, and even though BIA roads are generally open to public use, id. at § 170.8. BIA roads are constructed on reservations "to provide an adequate system of road facilities serving Indian lands," id. at § 170.3, and are held by the BIA in trust for the benefit of the tribe, see United States v. Mitchell, 463 U.S. 206, 224, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). An "Indian reservation road" serving Indian land and held in trust for a tribe is a "tribal road."
 
 
 9
 Precedent supports this conclusion. The Supreme Court declined to distinguish between tribal and BIA roads in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 148 n. 14, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (noting, in the context of federal preemption, "we see no basis, and respondents point to none, for distinguishing between roads maintained by the Tribe and roads maintained by the Bureau of Indian Affairs"). The Ninth Circuit also equated a BIA road with a tribal road in Allstate v. Stump, 191 F.3d 1071, 1072 (9th Cir.1999) (describing an accident on Route 9, a BIA road,[3] as occurring "on a tribal road in the Rocky Boy Reservation"). As a definitional matter, Route 5 is a tribal road not subject to the rule barring jurisdiction in Strate.
 
 
 10
 
 B. Route 5 is not "non-Indian fee land" under Montana.
 
 
 
 11
 Having concluded that Route 5 falls outside the direct scope of Strate, we nevertheless consider whether the facts support tribal jurisdiction under the Montana rule that tribes lack authority over the conduct of nonmembers on non-Indian fee land within a reservation. Montana, 450 U.S. at 565-66, 101 S.Ct. 1245; Strate, 520 U.S. at 446, 117 S.Ct. 1404 (summarizing Montana and stating that "[t]he term `non-Indian fee lands,' as used in this passage and throughout the Montana opinion, refers to reservation land acquired in fee simple by non-Indian owners"). We hold that they do, because Route 5 cannot be considered "non-Indian fee land."
 
 
 12
 Although the Northern Cheyenne tribe reserved no express right of dominion when it granted the Route 5 right-of-way to the BIA, the grant is held by the federal government in trust for the tribe. It is hardly an unencumbered fee (and only loosely owned by a non-Indian). It is well established that the BIA holds a fiduciary relationship to Indian tribes, and its management of tribal rights-of-way is subject to the same fiduciary duties. Mitchell, 463 U.S. at 224-226, 103 S.Ct. 2961. The Route 5 right-of-way was granted to the Bureau of Indian Affairs "to provide an adequate system of road facilities serving Indian lands." 25 C.F.R. § 170.3. The state recipient of the right-of-way held in Strate to constitute non-Indian fee land had no comparable duty. That right-of-way was granted to North Dakota for a specific, non-Indian related purpose: "to facilitate public access to Lake Sakakawea, a federal water resource project under the control of the Army Corps of Engineers." Strate, 520 U.S. at 455, 117 S.Ct. 1404.[4] Route 5 is not "land acquired in fee simple by non-Indian owners." Strate, 520 U.S. at 446, 117 S.Ct. 1404.
 
 
 13
 That the tribal court may exercise jurisdiction over a claim arising on Route 5 is buttressed by the Supreme Court's application of the Montana test in Strate.[5] In determining that the state highway there in question constituted non-Indian fee land, the Strate Court hinged tribal jurisdiction on the degree to which the tribe had retained gatekeeping rights over the right-of-way. Strate, 520 U.S. at 455-56, 117 S.Ct. 1404. Examining the Route 5 right-of-way against similar standards, we conclude that the scope of rights and responsibilities retained by a tribe over a BIA road exceed those retained over the state highway in Strate, and that these additional retained rights suffice to maintain tribal jurisdiction over nonmember conduct on BIA roads.
 
 
 14
 In Strate, the Court found that the highway was non-Indian fee land because the grant extinguished in the tribe the landowner's right to occupy and exclude:
 
 
 15
 Forming part of the State's highway, the right-of-way is open to the public, and traffic on it is subject to the State's control. The Tribes have consented to, and received payment for, the State's use of the 6.59-mile stretch for a public highway. They have retained no gatekeeping right. So long as the stretch is maintained as part of the State's highway, the Tribes cannot assert a landowner's right to occupy and exclude. We therefore align the right-of-way, for the purpose at hand, with land alienated to non-Indians. Our decision in Montana, accordingly, governs this case. Id. at 455-56, 117 S.Ct. 1404 (citations omitted). In determining that the tribe had lost its right to occupy and exclude (and the corresponding right to exercise tribal jurisdiction), Strate relied on five factors: (1) the right of way formed part of the State's highway, (2) it was held open to the public, (3) traffic was subject to state control, (4) the tribe consented to the State's use of the property, and (5) the tribe received payment for use of the property. Id.
 
 
 16
 We consider these factors in evaluating the status of the Route 5 right-of-way. Although the Northern Cheyenne relinquished certain gatekeeping rights in allowing public use of Route 5 and in collaborating with the BIA to maintain it, the Tribe maintained others of significance. The BIA right-of-way is not granted to the State, and forms no part of the State's highway system. The Code of Federal Regulations specifically distinguishes BIA roads on reservations from other public roads on reservations that are federally funded via the State through the Federal Aid Highway Act. 25 C.F.R. § 170.2(f).
 
 
 17
 Moreover, the Route 5 grant preserves to the Tribe considerable rights and responsibility over traffic and maintenance on the right-of-way. See generally 25 C.F.R. § 170. For example, the Code of Federal Regulations makes clear that "[t]he administration and maintenance of Indian reservation roads and bridges is basically a function of the local government," 25 C.F.R. § 170.6, which, as regards Route 5, is the Northern Cheyenne Tribe. The Commissioner of Indian Affairs, who is responsible for BIA road planning and design, must secure tribal consent at every stage of road design and construction:
 
 
 18
 The Commissioner ... shall keep the appropriate local tribal officials informed of all technical information relating to the project alternatives of proposed road developments. The Commissioner shall recommend to the tribe those proposed road projects having the greatest need as determined by the comprehensive transportation analysis. Tribes shall then establish annual priorities for road construction projects. Subject to the approval of the Commissioner, the annual selection of road projects for construction shall be performed by tribes.
 
 
 19
 25 C.F.R. § 170.4a. The Commissioner must also obtain tribal consent before assigning rights-of-way for surveying and construction. 25 C.F.R. § 170.5(a). The Commissioner must make recommendations to local (tribal) officials about maximum speed and weight limits, and other regulatory needs, and may only erect corresponding signs with tribal permission. 25 C.F.R. § 170.8(b). Only the tribe is authorized to enact and enforce such ordinances on Indian lands. Id. Although Part 170.8(a) designates BIA roads as generally open for public use, the Commissioner may, on behalf of the tribe, restrict such use or close the road to all public use "when required for public safety, fire prevention or suppression, or fish and game protection, or to prevent damage to unstable roadbed." 25 C.F.R. § 170.8(a).[6] Because of these provisions, traffic on Route 5 is subject to a degree of tribal control not present in Strate.
 
 
 20
 In granting the Route 5 right-of-way, the Northern Cheyenne Tribe relinquished some, but not all, of the sticks that form the landowner's traditional bundle of gatekeeping rights. The tribe has consented to public use of the road. However, traffic on the road remains subject to the authority of the tribe, both in rulemaking and enforcement. No meaningful compensation was received by the Tribe in exchange for the right-of-way,[7] presumably because the right-of-way is maintained, as all BIA properties are, for the benefit of the tribe. We conclude that under Montana, the Tribe retained enough of its gatekeeping rights that Route 5 cannot be considered non-Indian fee land, and that the Tribe thus maintains jurisdiction over Route 5.
 
 
 21
 We hold that the nature and purpose of the grant, the continuing control exercised by the Tribe over the road, and the Supreme Court's previous treatment of BIA roads support the conclusion that the tribal court had jurisdiction to entertain Means's suit against the McDonald family.
 
 2. Intervention
 
 22
 The Tribe sought and was denied intervention in the district court action.[8] The Tribe argues the district court applied the wrong standard, inappropriately requiring that an intervenor must possess a "direct economic stake" in the action. The Tribe asserts that its interest in preserving jurisdiction over Route 5 and "to provide a judicial forum for its members" suffices to justify intervention.
 
 
 23
 A petitioner seeking intervention of right under Federal Rule of Civil Procedure Rule 24(a) "must (1) make a timely motion, (2) claim a significantly protectable interest in the property that is the subject of the action, (3) demonstrate an impairment of its ability to protect that interest, and (4) prove that the interest is inadequately represented by the parties to the action." Montana v. U.S. Environmental Protection Agency, 137 F.3d 1135, 1141 (9th Cir.1998).
 
 
 24
 The petition for intervention fails because the Tribe cannot show a protectable interest in the property that is the subject of the action. The Tribe lacks any interest in the Means's damages claim; it seeks only to protect a general sovereignty interest in controlling Route 5. When we considered the similar question of whether a tribe is an "indispensable party" under Rule 19(a), we concluded that a tribe does not have "a legally protected interest in maintaining a court system," and that holding that a tribe is a necessary party "whenever [its] jurisdiction is challenged would lead to absurd results." Yellow-stone County v. Pease, 96 F.3d 1169, 1173 (9th Cir.1996). The Tribe also claims as a protectable property interest its ability to collect fees from non-member contractors who work on Route 5, but the property at issue here is not Route 5 itself but a tort claim for damages.
 
 
 25
 The Tribe has not shown that its interest is inadequately represented. Appellant Means has argued vigorously that the tribal court has jurisdiction over torts occurring on Route 5. As evidence that Means cannot adequately represent the Tribe's interests, the Tribe points to his omission of one argument that it believes provides support for a finding of tribal jurisdiction. However, Means has presented a wide array of arguments to show that Route 5 is the equivalent of a tribal road.
 
 
 26
 Courts have broad discretion to deny permissive intervention under Federal Rule of Civil Procedure 24(b). See, e.g., San Jose Mercury News, Inc., 187 F.3d at 1100. We cannot say that the district court erred in denying the Tribe permission to intervene.
 
 CONCLUSION
 
 27
 Accordingly, the district court's grant of summary judgment for the defendant on grounds that the tribal court lacked jurisdiction is REVERSED. The district court's decision to deny the Northern Cheyenne Tribe's petition to intervene is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 We review a grant of summary judgment de novoWeiner v. San Diego County, 210 F.3d 1025, 1028 (9th Cir.2000).
 
 
 [2]
 Montana announced two exceptions to the general rule that tribes lack jurisdiction over nonmembers on non-Indian land: the first applies to non-members who enter consensual relationships with the tribe or its members; the second applies to activity that directly affects the tribe's political integrity, economic security, health, or welfare. Montana, 450 U.S. at 565-66, 101 S.Ct. 1245. Neither exception applies here.
 Judge Wallace argues in dissent that Montana somehow trumps the later Iowa Mutual presumption, suggesting that the Supreme Court "resolved the conflict between the language in Iowa Mutual, which seemed to favor tribal jurisdiction over nonmembers, and its holding in Montana, which did not, by confirming Montana's primacy with respect to tribal inherent authority." [Dissent at 1047-48.] However, no such conflict of language exists between the two opinions: Iowa Mutual affirmed tribal civil jurisdiction over the activities of nonmembers on Indian reservation land, and Montana restricts tribal civil jurisdiction over nonmember activities that occur on non-Indian fee land.
 Contrary to Judge Wallace's implication, it thus follows that the Supreme Court declined to rely on Iowa Mutual in deciding Strate, which concerned tribal civil jurisdiction over an act that occurred not on tribal land but on non-Indian fee land. The Supreme Court's affirmation of Montana in that context does not weaken the Iowa Mutual rule that "[c]ivil jurisdiction over [the activities of non-Indians on reservation land] presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." 480 U.S. at 18, 107 S.Ct. 971.
 
 
 [3]
 The Brief for Appellees Vina Stump and Vernon The Boy identifies the tribal road at issue inAllstate v. Stump as Route 9, and Means has provided this court with documentation showing that a Route 9 right-of-way similar to that for Route 5 was granted to the BIA.
 
 
 [4]
 Similarly, we decided that tribal jurisdiction was lacking over an accident that occurred on a reservation right-of-way inBoxx v. Long Warrior, 265 F.3d 771, 775 (9th Cir.2001), because that right-of-way was granted to the National Park Service "for road purposes in perpetuity, including without limitation by reason of enumeration, the right to construct, maintain and use road, road turn offs, scenic view areas and parking areas."
 
 
 [5]
 Although a claim arising on Route 5 is not governed by the result inStrate, that opinion provides a helpful model of how we should evaluate a tribal road right-of-way under Montana.
 
 
 [6]
 While this does not differ greatly from what happens on other state and federal roads, it also differs little from what happens on other tribal roads: generally, all are open for public use until they are closed for one of the above-listed public purposes
 
 
 [7]
 The grant of easement states that the tribe received one dollar in exchange for the right-of-way
 
 
 [8]
 The Tribe sought intervention as a matter of right, and alternatively sought permissive intervention. The decision to deny intervention as of right is reviewed de novoWaller v. Financial Corp. of America, 828 F.2d 579, 582 (9th Cir.1987). The decision to deny permissive intervention is "directed to the sound discretion of the district court." San Jose Mercury News v. U.S. District Court, 187 F.3d 1096, 1100 (9th Cir.1999).
 
 
 WALLACE, Senior Circuit Judge, dissenting:
 
 28
 The majority concludes that a tribal court has the inherent authority to exercise civil jurisdiction over tribal nonmembers acting on tribal land within reservation boundaries. I dissent because I believe the majority's decision is inconsistent with over two decades of Supreme Court precedent on the subject of tribal inherent authority. The Court long ago cast aside the notion that a tribe has the inherent authority to exercise jurisdiction over anyone within reservation boundaries. Montana v. United States, 450 U.S. 544, 565, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Indeed, tribal inherent authority has consistently been confined to those circumstances in which a particular jurisdictional exercise is necessary to protect the tribe's ability to govern itself. Strate v. A-1 Contractors, 520 U.S. 438, 459, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).
 
 
 29
 As the Supreme Court has stated, a tribe has the inherent authority "to punish tribal offenders, ... to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members." Montana, 450 U.S. at 564, 101 S.Ct. 1245 (citation omitted). However, a tribe does not have the inherent authority to exercise criminal jurisdiction over a non member who commits a criminal act within reservation boundaries. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) (a tribe lacks inherent authority to exercise criminal jurisdiction over non-Indians). A tribe also, with two exceptions, lacks the inherent authority to exercise civil jurisdiction over non-members acting on "fee land" (land owned in fee by tribal nonmembers within reservation boundaries). Montana, 450 U.S. at 563-66, 101 S.Ct. 1245 (tribe lacks the inherent authority to ban hunting and fishing by nonmembers on non-Indian property within reservation boundaries), Strate, 520 U.S. at 459, 117 S.Ct. 1404 (tribal court lacks the inherent authority to exercise jurisdiction over tribal nonmember that allegedly committed a tort on fee land).
 
 
 30
 In its decisions on the subject of tribal inherent authority, the Court has repeatedly emphasized that "[a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations." Id. (quoting Montana, 450 U.S. at 564, 101 S.Ct. 1245) (quotation marks omitted, alteration in original). In keeping with this principle, the Court has stated that
 
 
 31
 the restriction on tribal criminal jurisdiction recognized in Oliphant rested on principles that support a more general proposition. In the main, ... the inherent sovereign powers of an Indian tribe — those powers a tribe enjoys apart from express provision by treaty or statute — do not extend to the activities of nonmembers of the tribe.
 
 
 32
 Id. at 445-46, 117 S.Ct. 1404 (quoting Montana, 450 U.S. at 565, 101 S.Ct. 1245) (quotation marks omitted).
 
 
 33
 The rule that a tribe may not exercise jurisdiction over a nonmember has two exceptions. First, a tribe may exercise civil jurisdiction over a nonmember if the nonmember has entered into a "consensual relationship[] with the tribe or its members." Id. at 446, 117 S.Ct. 1404. Second, a tribe may exercise civil jurisdiction over a nonmember if the nonmember's "activity ... directly affects the tribe's political integrity, economic security, health, or welfare." Id.
 
 
 34
 The majority's mistake now becomes clear. The majority establishes a presumption in favor of tribal civil jurisdiction over nonmembers in cases involving tribal land (land owned by the tribe within reservation boundaries). Maj. Op. at 1040. This startling statement turns the Court's longstanding approach to tribal inherent authority on its head.
 
 
 35
 The majority relies on three cases to accomplish this end. The first is Strate v. A-1 Contractors, 520 U.S. at 454, 117 S.Ct. 1404. Relying on Montana, the Strate opinion reasoned that "tribes retain considerable control over nonmember conduct on tribal land." Id. While I agree with this statement, I do not agree that it amounts to a general presumption in favor of tribal civil jurisdiction over nonmembers in cases that arise on tribal land. Both the footnote appended to the end of the quotation taken by the majority from Strate, id. n. 8, and the reliance on Montana that precedes the quoted language suggest that the court was referring to a tribe's ability to "prohibit nonmembers from hunting or fishing on land belonging to the Tribe ...." Montana, 450 U.S. at 557, 101 S.Ct. 1245. That a tribe has this inherent authority is well settled. This does not mean that a tribe may exercise civil jurisdiction over nonmembers in all case that arise on tribal land. Indeed, Strate, after applying Montana's presumption against a tribe's inherent authority in a case that arose on fee land, left open the question of whether the Montana rule extended to accident cases that arise on a tribal road within a reservation. Strate, 520 U.S. at 442, 117 S.Ct. 1404.
 
 
 36
 The majority also relies on Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), a case approaching its half-century birthday. Williams assumed without deciding that tribal courts have criminal and civil jurisdiction over anyone acting within reservation boundaries, not just on tribal land. Id. at 223, 79 S.Ct. 269. Because this assumption was cast aside long ago, it is hardly support for the majority's presumption theory. See Oliphant, 435 U.S. at 212, 98 S.Ct. 1011; Montana, 450 U.S. at 566-67, 101 S.Ct. 1245; Strate, 520 U.S. at 442, 117 S.Ct. 1404.
 
 
 37
 The third case the majority refers to is Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). LaPlante, a tribe member, was injured while driving a cattle truck within reservation boundaries. Id. at 11, 107 S.Ct. 971. LaPlante brought suit in tribal court in part against Iowa Mutual, his employer's insurer, for bad faith refusal to settle. Id. After the tribal court denied Iowa Mutual's motion to dismiss for lack of jurisdiction, Iowa Mutual raised its jurisdictional argument in a diversity action in federal court. Id. at 12-13, 107 S.Ct. 971. LaPlante moved to dismiss the federal action because Iowa Mutual had not yet exhausted its jurisdictional argument in the tribal court system. Id. at 13-14, 107 S.Ct. 971. The district court granted LaPlante's motion and both the United States Court of Appeals for the Ninth Circuit and the Supreme Court affirmed.
 
 
 38
 Iowa Mutual had argued that the federal court could decide the jurisdictional issue before the tribal courts had resolved it because "the statutory grant of diversity jurisdiction over[rode] the federal policy of deference to tribal courts." Id. at 17, 107 S.Ct. 971. The Court rejected this argument stating that
 
 
 39
 [t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. See Montana v. United States, 450 U.S. 544, 565-66, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 152-53, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); Fisher v. District Court, 424 U.S. at 387-389 [96 S.Ct. 943][sic]. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute.
 
 
 40
 Id. at 18, 107 S.Ct. 971.
 
 
 41
 Several years later, the plaintiff in Strate pointed to this language, as well as to language from another tribal court exhaustion case, National Farmers Union Insurance Cos. v. Crow Tribe of Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), to support her argument that the Montana rule applied only to a tribe's regulatory jurisdiction and not to tribal adjudicatory jurisdiction. Strate, 520 U.S. at 451-52, 117 S.Ct. 1404. After reviewing the authority upon which Iowa Mutual had relied, the Court rejected this argument. It stated that
 
 
 42
 [i]n keeping with the precedent to which Iowa Mutual refers, the statement [quoted above] stands for nothing more than the unremarkable proposition that, where tribes possess authority to regulate the activities of nonmembers, "[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts."
 
 
 43
 Id. at 453, 117 S.Ct. 1404 (citation omitted, third and fourth alterations in original).
 
 
 44
 The Court also "reiterate[d] that National Farmers and Iowa Mutual enunciate only an exhaustion requirement, a prudential rule based on comity. These decisions do not expand or stand apart from Montana's instruction on the inherent sovereign powers of an Indian tribe." Id. (citations and quotation marks omitted).
 
 
 45
 In other words, the Court resolved the conflict between the language in Iowa Mutual, which seemed to favor tribal civil jurisdiction over nonmembers, and its holding in Montana, which did not, by confirming Montana's primacy with respect to tribal inherent authority.
 
 
 46
 Consequently, and contrary to the majority's position, no current authority from the Supreme Court or from any circuit court supports the view that the Montana rule does not apply to tribal land cases. Of course, no Supreme Court or circuit court case has applied the Montana rule in the tribal land context either. Indeed, as I have said, the Supreme Court left this question open in Strate. Id. at 442, 117 S.Ct. 1404.
 
 
 47
 To determine Montana's applicability to the case before us, it seems to me, requires us to examine the thrust of the Supreme Court cases in this area and determine, as best we can, where the Court is leading us. I have done so and I would resolve the open question by extending the Montana rule to tribal land cases. The Supreme Court has repeatedly said that its decisions on the subject of tribal inherent authority rest on the "general proposition" that "the inherent sovereign powers of an Indian tribe ... do not extend to the activities of nonmembers of the tribe." Id. at 445-46, 117 S.Ct. 1404 (citation and quotation marks omitted). This is because the concept of inherent authority is meant to protect a tribe's ability to govern itself and to "control internal relations." Id. at 459, 117 S.Ct. 1404 (citation and quotation marks omitted). I have no doubt that nonmember acts on tribal land will often implicate these core concerns. Indeed, a tribe's ability to regulate hunting and fishing on its own land is undoubtedly vital to its economic welfare. Montana, 450 U.S. at 557, 101 S.Ct. 1245. I am equally confident, however, that many nonmember acts on tribal land will be wholly unrelated to a tribe's ability to govern itself. It would be difficult to argue, for example, that a tort committed by a nonmember against another nonmember on tribal land implicates the core concerns identified by the Court in Strate. Yet, a tribal court would have the inherent authority to hear such a case under the majority's position.
 
 
 48
 Unlike the majority's approach, the Montana rule and its exceptions protect only those jurisdictional exercises that are necessary "to protect tribal self-government or to control internal relations." Strate, 520 U.S. at 459, 117 S.Ct. 1404 (citation and quotation marks omitted). Thus, if Montana were applied to tribal land cases, a tribal court would not have inherent authority to hear the nonmember tort case described above but it would have inherent authority to exercise civil jurisdiction over a nonmember that either entered into a "consensual relationship with the tribe or its members" or engaged in an "activity that directly affect[ed] the tribe's political integrity, economic security, health or welfare." Strate, 520 U.S. at 446, 117 S.Ct. 1404.
 
 
 49
 Would the Northern Cheyenne Tribe have the inherent authority to assert jurisdiction over this case—a case involving a tort allegedly committed by a nonmember against a member—if we were to apply the Montana rule? I conclude that the tribal court lacks jurisdiction because neither Montana exception applies. The tort that is the subject matter before us on this appeal did not arise out of a consensual relationship between McDonald and the tribe or a tribe member. Further, the injury that Means sustained did not "imperil the political integrity, the economic security, or the health and welfare of the [t]ribe." Wilson v. Marchington, 127 F.3d 805, 815 (9th Cir.1997) (citation and quotation marks omitted).
 
 
 50
 I point out that our case deals only with the tribe's inherent jurisdiction. By concluding there is no inherent jurisdiction in this case, I express no view on whether it would be a better public policy for the Northern Cheyenne Tribe to have civil jurisdiction over a case like this. That is a question better left to Congress. Montana, 450 U.S. at 564, 101 S.Ct. 1245 (a tribe may not "exercise ... tribal power beyond what is necessary to protect tribal self-government or to control internal relations ... without express congressional delegation.") (citations omitted).