# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1564

_____

|  |  |  |
|---|---|---|
| Chad Dennis Nord; Dennis Nord, d/b/a/ Nord Trucking, | * * * | |
|  | * | Appeal from the United States |
| Appellees, | * | District Court for the |
|  | * | District of Minnesota. |
| v. | * | |
|  | * | |
| Donald Michael Kelly; Red Lake Nation Tribal Court, | * * | |
|  | * | |
| Appellants. | * | |

_____

Submitted: November 15, 2007
Filed: April 4, 2008

_____

Before MURPHY, HANSEN, and GRUENDER, Circuit Judges.

_____

HANSEN, Circuit Judge.

Donald Michael Kelly and the Red Lake Nation Tribal Court ("Tribal Court") appeal the district court's[1] grant of summary judgment to Chad Dennis Nord and his father Dennis Nord, doing business as Nord Trucking (collectively, "the Nords") in

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

this declaratory judgment action. The district court determined that the Tribal Court lacked jurisdiction over a suit against a non-Indian, nonmember of the Tribe arising from an automobile accident on a state highway within the reservation. We affirm.

I.

In this summary judgment context, we view the facts and their permissible inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); County of Mille Lacs v. Benjamin, 361 F.3d 460, 463 (8th Cir.), cert. denied, 543 U.S. 956 (2004). On December 16, 2000, Chad Nord, a non-Indian, was driving a semi-truck owned by Nord Trucking when he collided with an automobile driven by Donald Kelly, a member of the Red Lake Band of Chippewa Indians ("Red Lake Band"). The accident occurred on a stretch of Minnesota Highways 1 and 89, located within the boundaries of the Red Lake Indian Reservation in northern Minnesota. Tribal law enforcement authorities and a tribal ambulance service responded to the accident.

Minnesota Department of Transportation records indicate that, in 1955, the State of Minnesota ("the State") submitted an application and stipulation to the Department of the Interior's Bureau of Indian Affairs for federal approval of a right-of-way to construct a state public highway on the stretch of road at issue. Certified records of the Bureau of Indian Affairs-Land Titles & Records Office include an approved map of the right-of-way, a copy of the State's application and stipulation, and reference to a tribal resolution waiving payment for the land. The Red Lake Band General Council's unanimously approved resolution, dated April 1955, shows that the Red Lake Band considered the State's application for a right-of-way, consented to waive damages to tribal land in light of the benefit conferred by the road improvement, and required the State to pay damages to individual tribal members in exchange for the right-of-way.

In September 2001, Kelly sued the Nords in Tribal Court, seeking damages for personal injuries sustained in the accident. The non-Indian Nords filed a motion to dismiss for lack of jurisdiction, citing Strate v. A-1 Contractors, 520 U.S. 438, 442 (1997) (holding "tribal courts may not entertain claims against nonmembers arising out of accidents on state highways, absent a statute or treaty authorizing the tribe to govern the conduct of nonmembers on the highway in question"). The Tribal Court did not rule on the motion to dismiss until September 28, 2005, when it ultimately determined that it had jurisdiction over the dispute. In the meantime, the Nords had filed an action in federal court for a declaratory judgment that the Tribal Court lacked jurisdiction. The parties stipulated to a stay of the federal court action pending resolution of the Tribal Court appeal. The stay was lifted in early February 2006 after the Red Lake Court of Appeals affirmed the Tribal Court's determination that it had jurisdiction.

The Tribal Court then moved the federal district court to dismiss the declaratory judgment action and to stay discovery pending resolution of the motion to dismiss. The Nords filed a motion for summary judgment, arguing that the Tribal Court lacked jurisdiction over Kelly's suit against them. The Tribal Court moved alternatively for a continuance of the summary judgment hearing in order to permit discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. The district court granted summary judgment to the Nords and denied the Tribal Court's motions. The Tribal Court and Kelly[2] appeal the adverse grant of summary judgment.

II.

We review *de novo* the district court's grant of summary judgment, applying the same standards as the district court. Plains Commerce Bank v. Long Family Land &

---

[2]Kelly and the Tribal Court are both appellants and filed a joint appeal brief, but for the sake of simplicity and because tribal court jurisdiction is the only issue on appeal, we will refer only to the Tribal Court in our discussion.

Cattle Co., 491 F.3d 878, 884 (8th Cir. 2007), cert. granted, 128 S. Ct. 829 (Jan. 4, 2008) (No. 07-411). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id.; Fed. R. Civ. P. 56(c). We review for an abuse of discretion the district court's refusal to allow further discovery prior to ruling on a motion for summary judgment. Conner v. Reckitt & Colman, Inc., 84 F.3d 1100, 1103 (8th Cir. 1996). The district court does not abuse its discretion in denying a continuance and further discovery where the nonmoving party is not deprived of a fair chance to respond to the summary judgment motion. See Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 530 (8th Cir. 1999). Determining the extent to which an Indian tribe has the power to compel a non-Indian to submit to the civil jurisdiction of a tribal court is a question of federal law, Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 852 (1985), and we review the issue *de novo*, Plains Commerce Bank, 491 F.3d at 884.

This case is controlled by the Supreme Court's decision in Strate, holding that "tribal courts may not entertain claims against nonmembers arising out of accidents on state highways, absent a statute or treaty authorizing the tribe to govern the conduct of nonmembers on the highway in question." 520 U.S. at 442. The Court's analysis in Strate began with the general and well-established proposition that "absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." Id. at 445; see also id. at 453 ("As to non-members . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction," absent congressional direction otherwise.). The Court explained that, while "tribes retain considerable control over nonmember conduct on tribal land," id. at 454, generally, in the absence of a statute or treaty authorizing otherwise, and subject to two limited exceptions, "Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation," id. at 446. This general rule was set forth in Montana v. United States, 450 U.S. 544 (1981), which the Court in Strate referred to as "the pathmarking case concerning tribal civil authority over nonmembers." 520 U.S. at 445.

The Court in Strate determined that the state highway at issue was the equivalent of non-Indian fee land for purposes of determining the tribe's jurisdiction over nonmembers, subject to the general rule of Montana, and found that neither of Montana's exceptions applied. The Montana exceptions provide that "Indian tribes retain inherent sovereign powers to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands" in the following circumstances: (1) to "regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe, or its members, through commercial dealing[s]" and (2) "to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 565-66. "Both Montana and Strate rejected tribal authority to regulate nonmembers' activities on land over which the tribe could not assert a landowner's right to occupy and exclude." Nevada v. Hicks, 533 U.S. 353, 359 (2001) (internal marks omitted). But see id. at 360 (cautioning that "[t]he ownership status of land . . . is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations,' though "[i]t may sometimes be a dispositive factor" (quoting Montana, 450 U.S. at 564)). These Supreme Court precedents indicate that, in applying the Montana exceptions, the key concept is that tribal authority to regulate nonmember activities exists where it is "'necessary to protect tribal self-government or to control internal relations.'" Id. at 360 (quoting Montana, 450 U.S. at 564); see also Strate, 520 U.S. at 459.

The district court determined that the facts of the present case are on all fours with Strate, and we agree. In Strate, as here, the dispute involved claims against a non-Indian[3] arising out of an automobile accident that occurred on a state highway

---

[3]The dispute in Strate arose out of an accident between two non-Indians, whereas here, one party was a member. We find this to be a distinction without a difference, however, because in either case, the question is whether the tribe has jurisdiction over the nonmember.

within an Indian reservation on land in North Dakota held in trust for the Three Affiliated Tribes ("the Tribes"). The Court considered the federally granted right-of-way for the highway, finding that tribal officials had consented to the right-of-way, the Tribes had received just compensation, the purpose of the right-of-way was to facilitate public access, the traffic was subject to the state's control, and the easement included no reservation of tribal dominion or control over the right-of-way. See Strate, 520 U.S. at 455-56. In light of these facts, the Court determined that the Tribes did not enjoy "a landowner's right to occupy and exclude" on the stretch of highway at issue, rendering it the equivalent of non-Indian fee land within the reservation, and that neither of Montana's exceptions applied to a commonplace automobile accident dispute between strangers on a state public highway. Id. at 454-59. The Strate Court concluded that the parties were therefore left to pursue their claims "in the state court forum open to all who sustain injuries on North Dakota's highway." Id. at 459. Similarly here, the district court determined that no statute or treaty authorized the exercise of tribal jurisdiction over nonmembers on the state highway, the State had a federally granted right-of-way to construct and maintain this stretch of road as a public highway with the consent of the Red Lake Band and the payment of just compensation to individual members, and neither of the Montana exceptions applied because the parties were strangers involved in a commonplace automobile accident dispute.

The Tribal Court argues on appeal that the district court's "categorical" application of Strate ignores the Supreme Court's reasoning, which carefully considered the nature of the particular right-of-way at issue. We respectfully disagree. To the contrary, consistent with the analysis set out in Strate, the district court properly considered, and gave effect to, the relevant public records and pertinent regulations that established the federally granted right-of-way.

Specifically, the record contains Minnesota's 1955 stipulation and application to the Department of the Interior, pursuant to federal regulations, seeking permission

to open and establish a public highway on this stretch of Indian land and stating that it will be part of the state trunk highway system pursuant to the Constitution of the State of Minnesota.[4]  (J.A. at 57-62.)  The record also contains the 1955 tribal resolution, unanimously approved by the Red Lake Band's General Council, referencing Minnesota's right-of-way application to construct the stretch of public highway at issue. (Id. at 26.)  The resolution indicates that the road improvement will benefit the tribe, that the tribe waives compensation for damages, and that fair damages should be paid to individual tribal members.  (Id.)  An affidavit of the supervisor of the Minnesota Department of Transportation, Office of Land Management, certifies the existence of the easement, that the highway is serviced and maintained by the State of Minnesota, and that it is open to the public.  (Id. at 30.) Having considered these documents, the district court then "categorically" applied the holding of Strate, finding it unnecessary to consider evidence of the parties' particular conduct with regard to the right-of-way, and we agree with the district court's analysis.

Consistent with the reasoning of Strate, we give effect to the plain language of the right-of-way granting instruments.  There is no indication in the public records that the Red Lake Band retained any "gatekeeping right" over the public highway, no assertion that the right-of-way is no longer maintained as part of the State's highway, and no assertion that any statute or treaty grants or retains tribal authority over nonmembers in this situation.  See Strate, 520 U.S. at 456.  Therefore, the Red Lake Band has no "right of absolute and exclusive use and occupation" of that land, id. (internal marks omitted), and the public highway at issue, as in Strate, is the equivalent of alienated, non-Indian land for purposes of regulating the activities of nonmembers.  See also Boxx v. Long Warrior, 265 F.3d 771, 775 (9th Cir. 2001) (considering the plain language of a right-of-way for a National Park Service road over Indian land and determining that the tribe had "expressly reserved no right to

_____

[4]The state constitution creates a trunk highway system "which shall be constructed, improved and maintained as public highways by the state."  Minn. Const. art. 14, § 2.

exercise dominion or control over the right-of-way" (internal marks omitted)), cert. denied, 535 U.S. 1034 (2002), disapproved on other grounds, Smith v. Salish Kootenai Coll., 434 F.3d 1127, 1137 n.4 (9th Cir. 2006) (en banc).

The Tribal Court argues that additional discovery was necessary to demonstrate that the parties to the 1955 agreement believed the right-of-way would confer only limited rights to the State. Specifically, the Tribal Court asserts that evidence of the course of conduct between the Red Lake Band and the State would confirm their understanding that the right-of-way permitted only the construction, use, and maintenance of a highway and did not confer regulatory or adjudicatory authority on the State with regard to nonmembers.

We need not look to course-of-conduct evidence in this case. The Court in Strate plainly indicated that absent explicit authority otherwise, the loss of regulatory jurisdiction is implied with the loss of a landowner's right to occupy and exclude; and "[as] long as the stretch is maintained as part of the State's highway, the Tribe[] cannot assert a landowner's right to occupy and exclude." 520 U.S. at 456. Cf. South Dakota v. Bourland, 508 U.S. 679, 689 (1993) (stating that by taking reservation land for a dam and reservoir project, "and broadly opening up those lands for public use, Congress, through the Flood Control and Cheyenne River Acts eliminated the Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe"). This legal nature of a federally granted and unrestricted right-of-way to construct and maintain a public highway as a part of the state highway system on a reservation cannot be altered for purposes of nonmember governance by State practices that are merely deferential to, and respectful of, tribal authority. Cf. McDonald v. Means, 309 F.3d 530, 539 (9th Cir. 2002) (holding that a BIA road was a tribal road by considering the nature of the right-of-way at issue and finding that, although the tribe had relinquished certain gatekeeping rights by allowing public use of the road and collaborating with the BIA in maintaining it, the tribe had maintained other significant gatekeeping rights because

the right-of-way was not granted to the state and the road did not form any part of the state's highway system). We do not understand the Band to be asserting that the parties' conduct will show that this stretch of Highways 1 and 89 is no longer a state highway. Absent some specific language reserving regulatory or adjudicatory powers to the Red Lake Band in the right-of-way documents or an assertion that the highway is no longer maintained as part of the State's highway system, no further evidence is needed.

Alternatively, the Tribal Court argues that the State's stipulation accompanying its application for a right-of-way did not comply with the federal regulations, and as a result, the right-of-way is void *ab initio*. We respectfully disagree. The regulations in effect at the time of the agreement required the State's right-of-way application to include a stipulation "expressly agreeing" to the terms of 25 C.F.R. § 256.7 (1951), which placed certain obligations on the party applying for a right-of-way. (J.A. at 69.) The State's 1955 application included the required stipulation, stating explicitly that the State agreed to "abide by all pertinent rules and regulations of the Department of the Interior." (Id. at 62.) The stipulation then made "special reference" to three of the five subsections listed in 25 C.F.R. § 256.7. Because the State expressly agreed to abide by "all pertinent regulations," we agree with the district court's conclusion that the failure to individually reference each subsection of § 256.7 does not render the right-of-way void.[5] Additionally, the Red Lake Band's 1955 tribal resolution

_____

[5]The Tribal Court's assertion that the State limited the scope of the right-of-way by specifically enumerating only three subsections of the regulation is without merit. The terms of § 256.7, as it existed in 1955, prescribed five responsibilities of the State regarding the right-of-way, i.e., to construct and maintain the right-of-way in a workmanlike manner, to pay promptly all damages due to landowners, to indemnify the landowners against liability for damages arising from the applicant's use of the lands, to restore the lands, and not to interfere with the landowner's use of the right-of-way. (J.A. at 69.) The State's omission of "special reference" to two of its obligations to the Band, when it explicitly agreed to abide by all of them, does not reserve to the Band any adjudicative authority over nonmembers on the public highway.

evidences consent to the right-of-way as requested in the application and stipulation, and the Band has never administratively challenged the validity or scope of this right-of-way.

Finally, the Tribal Court asserts that additional discovery is necessary to determine the applicability of the Montana exceptions, but we conclude that the record is adequate for this analysis as well. The first exception "covers activities of nonmembers who enter consensual [commercial] relationships with the tribe or its members." See Strate, 520 U.S. at 456-57 (internal marks omitted). The record indicates that Nord was driving a semi-truck owned by Nord Trucking, a company that had a consensual commercial relationship with the Red Lake Band to haul and remove timber from the reservation, but the accident gave rise to a simple tort claim between strangers, not a dispute arising out of the commercial relationship. The accident did not involve the Red Lake Band itself, and although the individual injured was a member of the Red Lake Band, he was not a party to the commercial relationship. The Tribal Court asserts that additional discovery is necessary to determine the facts regarding whether Nord was driving in connection with a contract with the Red Lake Band or on a personal errand. We conclude that such facts would not be material in this situation because the dispute merely involves the tortious conduct of "a run-of-the-mill highway accident" between strangers, and no amount of discovery can alter the nature of that claim. See id. at 457 (internal marks omitted) (holding that the first exception did not apply to a highway traffic accident dispute that was "distinctly non-tribal in nature" (internal marks omitted)); see also Plains Commerce Bank, 491 F.3d at 886-87 (explaining that under Strate, the consensual relationship exception of Montana does not apply to a purely accidental encounter between two strangers but requires a nexus between a preexisting consensual commercial relationship between the parties and the personal injury claim).

The second Montana exception does not apply because Strate determined as a matter of law that the lack of tribal jurisdiction over a tort claim arising from an

ordinary automobile accident on a state highway running through Indian land does not threaten or have any direct effect on "the political integrity, economic security, or the health or welfare of the tribe." See Strate, 520 U.S. at 457-59 (internal marks omitted). The only distinguishing fact is that Strate involved a non-Indian plaintiff whereas the injured plaintiff in this case is a member of the Red Lake Band, but this distinction is insignificant. The Court in Strate expressly cautioned against reading the second Montana exception in isolation to apply to the personal health and welfare of a few individual members. See id. at 457-58 ("Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if Montana's second exception requires no more, the exception would severely shrink the rule."). "[A] tribe's inherent power does not reach beyond what is necessary to protect tribal self-government or to control internal relations." Id. at 459 (internal marks omitted).

We do not disagree with the Tribal Court's assertion that the Red Lake Band is unique in many respects and has long opposed intrusions on its land. See, e.g., 28 U.S.C. § 1360 (specifically exempting the Red Lake Band from legislation extending the state's civil jurisdiction over claims involving Indians); County of Beltrami v. County of Hennepin, 119 N.W.2d 25, 30 (Minn. 1963) (noting that the Red Lake Band was excluded from the legislation at its own insistence). However, we cannot agree with the assertion that, contrary to the language of Strate, the Band's ability to regulate and to exercise adjudicatory authority over nonmembers on the highway is important to its tribal sovereignty. The Band exercised its sovereignty by consenting to a right-of-way that permitted the State to construct and maintain a public highway on its reservation, without specifically reserving any regulatory or adjudicatory authority over nonmembers using the highway. Again, as long as the highway remains part of the State's highway system, the Red Lake Band has lost its "right of absolute and exclusive use and occupation, [which] implies the loss of regulatory jurisdiction over the use of the land by others." Strate, 520 U.S. at 456 (internal marks omitted).

III.

The district court did not abuse its discretion in refusing to permit further discovery, and summary judgment, declaring that the Tribal Court lacked jurisdiction over this dispute, was proper as a matter of law. Accordingly, we affirm the judgment of the district court.

MURPHY, Circuit Judge, concurring.

Although I concur in the result and in most of the court's analysis, I write separately to highlight more fully the unique legal status of the Red Lake Band of Chippewa Indians and the Red Lake Reservation. In respect of the band's sovereignty and special history, it is proper to examine all the circumstances thoroughly before its courts are divested of jurisdiction.

It is difficult to overstate the differences between the Red Lake Reservation and nearly all other Indian reservations. The Red Lake Band has retained extensive sovereignty over its reservation, subject only to federal law which specifically addresses Red Lake and to preemptive federal criminal law. It has retained much of the autonomy and sovereignty that existed on all reservations at the time the Supreme Court decided Worcester v. Georgia, 31 U.S. 515, 561 (1832), which recognized that Indian tribes maintained a government to government relationship with the United States to which the states were not parties. See Comm'r of Taxation v. Brun, 174 N.W.2d 120, 122 (Minn. 1970). Although the Court has long since abandoned the Worcester rule that "'the laws of [a State] can have no force'" within reservation boundaries, Nevada v. Hicks, 533 U.S. 353, 361–62 (2001), quoting Worcester, 31 U.S. at 561, that rule largely holds true as to the Red Lake Reservation.

Unlike other tribes and reservations, including the Three Affiliated Tribes of the Fort Berthold Indian Reservation where the accident in Strate occurred, the Red

Lake Band has retained its government to government relationship with the United States. As part of its retention of significant sovereignty, the tribe was only one of three to resist the extension of state criminal and civil jurisdiction to cover claims involving Indians. See 18 U.S.C. § 1162; 25 U.S.C. §§ 1321–26; 28 U.S.C. § 1360; but see State v. Holthusen, 113 N.W.2d 180, 187–88 (Minn. 1962) (state has jurisdiction over crimes committed on the Red Lake Reservation by non Indians against non Indians).

Also unlike nearly all other reservations, the land of the Red Lake Reservation "has never been formally ceded to the United States."[6] Brun, 174 N.W.2d at 122 ; see Minnesota v. Hitchcock, 185 U.S. 373 (1902) (detailed history of the formation of the Red Lake Reservation). The Red Lake Band successfully resisted allotment, making the reservation a "closed" reservation in which all lands are held communally by the tribe.[7] This status has made Red Lake perhaps the most insular and nonintegrated reservation in the United States; it has also preserved for the band an independence not experienced on other reservations. The tribe has the right to control who is allowed to enter and to live on the reservation. At one time the tribe required nonmembers working or engaging in business on the reservation to apply for passports. In the past the tribal council has barred journalists from the reservation. After the tragic shootings at Red Lake High School in March 2005, as one example, journalists who ventured onto the reservation past a designated parking lot faced arrest for trespass.

---

[6]The tribe ceded large portions of the original reservation to the United States but has never ceded the largest part of the current reservation centered around Lower Red Lake where the accident at issue occurred. See United States v. Minnesota, 466 F. Supp. 1382, 1386–87 (D. Minn. 1979) (describing three treaties by which the Red Lake Band ceded land to the federal government). The Red Lake Band refers to this land as the "diminished" reservation.

[7]The Red Lake Reservation is apparently one of only two reservations in the nation to enjoy this status.

The state's approach to the Red Lake Reservation is reflected in the Minnesota Department of Transportation's manner of dealing with the tribe. Employee Joseph McKinnon's affidavit indicates that the Department treats the Red Lake Reservation as a foreign jurisdiction and requests permission from the tribe before entering the reservation to perform maintenance work on the state highway, unlike the manner in which the state treats all other Minnesota reservations. Moreover, state law enforcement agencies, including the state patrol, do not have authority over members on the reservation, even on the state highway. See Red Lake Band of Chippewa Indians v. State, 248 N.W.2d 722, 728 (Minn. 1976); see also State v. Stone, 572 N.W.2d 725 (Minn. 1997) (state may not enforce driving laws against members of an Indian tribe within the tribe's reservation).

Despite the fact that the accident in this case involved a member of the band[8] and despite the significant difference between Red Lake and the Fort Berthold Indian Reservation, I agree that the record shows that this accident occurred on a state highway for which Minnesota had obtained a valid right of way that is open to the public and that is maintained as part of the state trunk highway system. I therefore agree that the district court did not err by granting summary judgment to the Nords.

---

[8]Unlike Strate the injured here, Donald Kelly, is a member of the Red Lake Band and therefore the band was not necessarily a "'stranger[] to the accident.'" Strate v. A-1 Contractors, 520 U.S. 438, 457 (1997), quoting A-1 Contractors v. Strate, 76 F.3d 930, 940 (8th Cir. 1996). Although the other driver, Chad Nord, is a nonmember, he was driving a vehicle owned by Nord Trucking which had a contract with the band to haul timber from the reservation. See Montana v. United States, 450 U.S. 565–66 (1981) ("A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."). There is, however, no evidence suggesting that that relationship had any causal effect on the accident.

While I cannot agree with the court's conclusion that "the facts of the present case are on all fours with <u>Strate</u>," I do agree that the district court did not abuse its discretion by denying the Rule 56(f) tribal court request for additional time to conduct discovery. The tribal court did not make its discovery needs known to the district court in a timely fashion. This federal action was filed on June 10, 2005, and it was only on May 1, 2006, after the Nords had filed for summary judgment and after the tribal court itself had moved for a stay of discovery, that it requested additional discovery. While the tribal court's choice to concentrate on legal theories for dismissal rather than to engage in expensive discovery is understandable, there was considerable opportunity exclusive of stayed time during which it could have pursued its discovery needs.

_____