# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3093

_____

Plains Commerce Bank,      *
     *
     Plaintiff/Appellant,      *
     *
     v.      *   Appeal from the United States
     *   District Court for the
Long Family Land and Cattle      *   District of South Dakota.
Company, Inc.; Ronnie Long;      *
Lila Long,      *
     *
     Defendants/Appellees.      *
     *
_____      *
     *
Cheyenne River Sioux Tribe,      *
     *
     Amicus Curiae - Amicus      *
     on Behalf of Appellee.      *

_____

Submitted: March 12, 2007
Filed: June 26, 2007

_____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

The Plains Commerce Bank (bank) brought this declaratory judgment action in the federal district court against Ronnie and Lila Long and the Long Family Land and

Cattle Company, Inc. (Long Company), seeking to have a tribal judgment of the Cheyenne River Sioux Tribal Court of Appeals declared null and void. That judgment upheld a jury verdict in the Longs' favor on their claim that the bank had discriminated against them as Indians and tribal members. The bank now argues that the tribal courts lacked jurisdiction over the Longs' discrimination claim and that it was denied due process by the tribal proceedings. The district court[1] granted summary judgment to the Longs, and we affirm.

I.

The Long Company is a family farming and ranching business incorporated under the laws of South Dakota and located on the Cheyenne River Sioux Indian Reservation. Under its articles of incorporation, at least 51% of the company's outstanding shares must be Indian owned at all times, ensuring the company's eligibility for Bureau of Indian Affairs (BIA) loan guarantees. See 25 C.F.R. § 103.7 (2000); see also id. § 103.25(b) (2006). Husband and wife Ronnie and Lila Long, who are both enrolled members of the Cheyenne River Sioux Tribe (Tribe), own at least 51% of the company's shares. Ronnie Long's father, Kenneth Long, who was not a tribal member, owned the remaining 49% of the company's shares until his death in 1995. The parties disagree about whether his shares were distributed to Ronnie Long,[2] but it is undisputed that the Longs have majority ownership of the company.

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

[2]In his will Kenneth purported to devise his interest in the company and his land on the reservation to his four children. Since Ronnie Long's siblings assigned their interest to him, the Longs claim 100% ownership of the Long Company. The bank disputes this, noting that it has filed a creditor's claim against the estate and asserting that Kenneth's interest in the company was never distributed by the probate court. The estate was still in probate at the time of the district court judgement.

The bank is a South Dakota corporation with its principal place of business outside the reservation. The bank had been lending to the Long Company for many years, and these loans were guaranteed by the BIA because of the Long Company's Indian owned status. Kenneth, Lila, Ronnie, and Ronnie's mother Maxine, an enrolled tribal member, also personally guaranteed loans extended to the company. Prior to their deaths, Kenneth and Maxine Long mortgaged to the bank some 2,230 acres of fee land inside the reservation in order to secure loans for the Long Company operation. At the time of his death, Kenneth and the Long Company owed the bank $750,000.

In the spring of 1996 a bank officer came onto the reservation to inspect the Longs' land, cattle, hay, and machinery. Thereafter, the bank and the Longs entered into negotiations for a new loan agreement, and tribal officers and BIA employees helped to facilitate the negotiating sessions which took place in the Tribe's offices. The final agreement, which was signed at the bank's offices, provided that the mortgaged land would be deeded over to the bank in consideration for cancelling some debt and making additional loans to the Long Company for use in its ranching operations. The Long Company was given a two year lease on the property with an option to purchase.

According to the Longs, the bank initially offered them more favorable terms, proposing to sell the mortgaged land back to them with a twenty year contract for deed. The bank later sent a letter to Ronnie Long withdrawing that offer, however, citing "possible jurisdictional problems" posed by the Long Company's status as an "Indian owned entity on the reservation." The Longs also claim that the bank never provided the promised operating loans to the Long Company and as a result the company was not able sustain its ranching operation through the particularly harsh winter of 1996-97.

Because the Longs lost hundreds of livestock that winter, they were unable to exercise their option to repurchase their land, which required full payment for the land within sixty days of the expiration of their two year lease. When they did not vacate the property after their lease expired in late 1998, the bank initiated state eviction proceedings against them. The bank also asked the Cheyenne River Sioux Tribal Court to serve the Longs with a notice to quit, but by this time the bank had already sold 320 acres of the land to Ralph and Norma Pesicka. In June of 1999, while the Longs continued to occupy a 960 acre parcel of the land, the bank sold the remaining 1,910 acres to Edward and Mary Maciejewski under a ten year contract for deed with a lower interest rate than that offered to the Long Company under its lease with option to purchase. Neither the Pesickas nor the Maciejewskis are tribal members.

The Longs filed a complaint in tribal court alleging that the bank had impermissibly engaged in self help measures when it sold the land while the Longs were still in possession. The Longs moved for a restraining order to prevent the bank from going through with the sales, and the bank moved to dismiss for lack of subject matter jurisdiction. The tribal court denied both motions. The Longs then amended their complaint to add their company as a plaintiff and to include a number of additional causes of action against the bank, including breach of contract, bad faith, and lack of consideration.

The Longs also brought a discrimination claim, seeking to have the land sales set aside on the ground that the sale to nonmembers "on terms more favorable" than the bank had extended to the Longs evidenced "unequal treatment and unfair discrimination against the Longs . . . ." The claim did not allege any statutory violation. The Longs introduced as evidence the bank's letter explaining its reluctance to sell the land to the Long Company on account of its status as an Indian owned entity. The bank filed a counterclaim in the tribal court for wrongful holdover of possession of the land, seeking damages and the Longs' eviction. While the Longs requested that their claims be tried to a jury, the bank did not.

In a motion for summary judgment on its counterclaim, the bank conceded that the tribal court had jurisdiction over the subject matter because enrolled tribal members held majority ownership of the Long Company. Shortly before the jury was charged, the bank changed its position. At that point the bank asserted in a short colloquy with the tribal court that jurisdiction was lacking over the Longs' discrimination claim, alleging that the claim arose under federal law and could therefore not be heard in tribal court under Nevada v. Hicks, 533 U.S. 353 (2001). The trial judge rejected this argument and stated, "I think we have authority to enforce federal laws." At no time did the Longs state that their claim arose under federal law. The bank did not challenge tribal jurisdiction over the Longs' other claims.

A seven member jury was instructed on four of the Longs' claims: breach of contract, bad faith, discrimination, and improper use of self help remedies. The bank had the opportunity to request that nonmembers or non Indians be summoned to serve on the jury, but it made no such request. On the Longs' discrimination claim the judge instructed the jury: "A person or entity engages in discrimination under these instructions when that person or entity intentionally denies a privilege to a person based solely upon that person's race or tribal identity."[3] No reference was made to any statute or to federal law. A unanimous jury found for the Longs on all counts except the self help claim and returned a general verdict in their favor for $750,000 in damages plus interest. In addition, the trial court awarded the Longs the option to purchase the 960 acres of land which they continued to occupy. The court also dismissed the bank's counterclaim in light of the jury verdict and tribal law.

The bank filed a post trial motion challenging tribal jurisdiction over the Longs' discrimination claim, contending that the claim "would fall under 42 U.S.C. § 1981" and therefore could only be adjudicated in federal or state court. The bank did not

_____

[3]The jury verdict form similarly read: "Did the Defendant Bank intentionally discriminate against the Plaintiffs Ronnie and Lila Long based solely on their status as Indians or tribal members in the lease with option to purchase?"

challenge tribal jurisdiction over the Longs' other claims, however. The trial court denied the motion. In discussing the basis for the discrimination claim, the court stated that the Tribe "does not appear to have specific code provisions prohibiting private discrimination and the Court is therefore instructed to look to relevant federal law." In the course of upholding the judgment the trial court referenced 42 U.S.C. § 2000d, a federal statute prohibiting racial discrimination in the distribution of benefits from a federally assisted program.

The bank appealed the judgment to the tribal court of appeals which affirmed tribal jurisdiction. The appellate court concluded that although the tribal court might lack authority to adjudicate federal causes of action, the Longs' claim for discrimination did not arise under federal law even if the trial judge believed that it contained some "federal ingredients." Instead, the claim arose under the traditional common law of the Tribe. Relying in part on an amicus brief submitted by the Tribe, the court of appeals concluded that under traditional Lakota notions of justice, fair play, and decency to others, discrimination because of race or tribal affiliation was tortious conduct. It noted that the tribal code gives the tribal courts jurisdiction over tort claims like that of the Longs. It also concluded that Supreme Court precedent permitted the exercise of such jurisdiction over a non Indian bank because the bank had formed a consensual relationship with members of the Tribe and because the bank's conduct implicated the Tribe's economic security.

The bank subsequently filed this action in federal district court seeking a declaration that the tribal judgment was null and void and not entitled to recognition because the tribal court lacked jurisdiction over the Longs' discrimination claim and because the proceedings violated due process. The bank alleged that by upholding the jury verdict on the discrimination claim on the basis of tribal law when the trial judge believed the claim to be founded on federal law, the tribal court of appeals had deprived it of notice and a fair opportunity to defend against the claim.

Both parties moved for summary judgment, and the district court granted it to the Longs. The court concluded that the tribal courts had jurisdiction under one of the categories of permissible tribal jurisdiction over nonmembers which were recognized in Montana v. United States, 450 U.S. 544 (1981), because the bank had entered into a consensual relationship with the Longs and their company. The court emphasized that the Longs' claim arose directly out of their relationship with the bank and noted that the bank had conceded tribal jurisdiction at an earlier point in the tribal proceedings. The district court found no due process violation, noting that appellate courts may affirm on any ground supported by the record and that the bank had had a full opportunity to develop the record on the issue of discrimination.

The bank appeals from the grant of summary judgment. It argues that the district court erred in concluding that the tribal court had jurisdiction under the Montana exception for consensual relationships between members and nonmembers. It contends that it formed a business relationship only with the Long Company, a South Dakota corporation with no racial or tribal identity. The bank also argues that the Longs' discrimination claim was federal in nature and that tribal courts may not entertain federal causes of action even if one of the Montana exceptions is met. Although the bank alleged in the district court that the Longs' claim arose under 42 U.S.C. § 1981, it contends on appeal that it was manifestly a § 2000d action. Finally, the bank argues that the tribal judgment is not entitled to comity in federal court because the proceedings denied it fundamental due process. It claims that by invoking tribal common law to uphold the discrimination claim, the tribal court of appeals employed a new theory of recovery and thereby deprived the bank of a fair opportunity to defend itself. Both the Longs and the Tribe as their amicus urge us to adopt the reasoning of the district court and affirm its judgment.

II.

We review a grant of summary judgment de novo, applying the same standard as the district court. Passions Video, Inc. v. Nixon, 458 F.3d 837, 840 (8th Cir. 2006).

Summary judgment is appropriate where there is no genuine material issue of fact and the moving party is entitled to judgment as a matter of law. <u>Id.</u>; <u>see also</u> Fed. R. Civ. P. 56(c). Whether a tribal court properly exercised jurisdiction over a claim is an issue of federal law reviewed de novo. <u>Duncan Energy Co. v. Three Affiliated Tribes</u>, 27 F.3d 1294, 1300 (8th Cir. 1994); <u>see also</u> <u>Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians</u>, 471 U.S. 845, 852-53 (1985) (claim arises under 28 U.S.C. § 1331).

In recognition of the status of Indian tribes as distinct cultural and political communities, <u>see</u> <u>Santa Clara Pueblo v. Martinez</u>, 436 U.S. 49, 55 (1978), the federal government has long encouraged tribal self government, <u>Iowa Mut. Ins. Co. v. LaPlante</u>, 480 U.S. 9, 14 (1987). Although the tribes no longer possess the "full attributes of sovereignty," <u>United States v. Kagama</u>, 118 U.S. 375, 381 (1886), they nevertheless retain those internal powers necessary to their self government which have not been withdrawn by the federal government. <u>See</u> <u>United States v. Wheeler</u>, 435 U.S. 313, 323 (1978).

Because the authority of the tribes is founded on their "right . . . to make their own laws and be ruled by them," tribal jurisdiction does not normally extend to the conduct of nonmembers unless Congress has expressly granted such authority. <u>See</u> <u>Strate v. A-1 Contractors.</u>, 520 U.S. 438, 446, 459 (1997), <u>quoting</u> <u>Williams v. Lee</u>, 358 U.S. 217, 220 (1959). In the watershed case of <u>Montana v. United States</u>,, the Supreme Court identified two exceptions to this general principle. 450 U.S. 544 (1981).

Under <u>Montana</u>, tribes may exercise jurisdiction over nonmembers if they have entered into certain kinds of consensual relationships or if they have engaged in conduct on tribal lands which would harm tribal interests:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or

other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

Id. at 565-66 (citations omitted).

The unifying principle behind both exceptions is that absent express congressional delegation, a tribe has civil authority[4] over non Indians only where such authority is "necessary to protect tribal self-government or to control internal relations." Id. at 564. Although Montana specifically addressed the regulatory rather than adjudicatory jurisdiction of tribes, see id. at 557, there is nevertheless a presumption that if a tribe has authority under Montana to regulate the activities of a nonmember, jurisdiction over disputes arising out of those activities exists in the tribal courts. Strate, 520 U.S. at 453.

The Longs argue, and the district court concluded, that the Tribe's exercise of jurisdiction over the bank falls within its inherent authority under the first Montana exception.[5] Consideration of this basis for tribal jurisdiction involves two separate questions: whether the bank formed a consensual relationship with the Tribe or its members and whether the tribal tort law invoked by the Longs is an appropriate "other means" by which a tribe may regulate nonmember conduct.

The bank argues that it never formed a consensual relationship with any tribal member because it provided loans to the Long Company, a South Dakota corporation. It contends that a corporation does not take on the tribal identity of its owners,

---

[4]Tribes are unable to exercise criminal jurisdiction over non Indians. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191 (1978).

[5]Neither party suggests that any treaty or federal statute has directly enlarged or contracted the inherent tribal authority under discussion.

pointing to the general principle that a corporation and its shareholders are distinct entities, see, e.g., Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003), and arguing that there is no justification here to pierce the corporate veil separating the Longs and their company. The Longs respond that the bank should not be heard to challenge the tribal character of their company when for many years the bank took advantage of financial incentives available to it only because the Long Company was Indian owned. They also argue that the bank formed relationships with them as individual tribal members.

We agree that the bank's argument ignores the broader context of its interaction with the Long Company and with the Longs themselves. The Long Company, which was formed to take advantage of BIA incentives for developing Indian enterprises located on the reservation, was overwhelmingly tribal in character, as were its interactions with the bank. See Smith v. Salish Kootenai Coll., 434 F.3d 1127, 1134-35 (9th Cir. 2006) (en banc) (nonprofit corporation that was designated a tribal corporation in its charter and that operated inside the reservation can be treated as a tribal member under Montana). The bank directly benefitted from the Long Company's status as an Indian owned business entity, see 25 C.F.R. § 103.7 (2000) (requiring at least 51% Indian ownership), which qualified the company for BIA guaranteed loans and allowed the bank to greatly reduce its lending risk, see id. § 103.2 (2006). The bank could not have been unaware that it might be subject to tribal jurisdiction since in its letter to Ronnie Long withdrawing its offer to sell the land back to the Longs, the bank alluded to the "jurisdictional" implications of the Long Company's Indian ownership.

Moreover, the bank's loans to the Long Company were not simple corporate transactions. The bank repeatedly interacted with Lila, Ronnie, and Maxine Long. All three tribal members personally guaranteed the debt of the Long Company. The bank also sought the assistance of the Tribe in renegotiating a loan agreement with the

Longs and their company, as well as in serving the Longs with notice to quit after they were unable to exercise their option to purchase.[6]

Because the bank not only transacted with a corporation of conspicuous tribal character, but also formed concrete commercial relationships with the Indian owners of that corporation, we conclude that it engaged in the kind of consensual relationship contemplated by Montana. At its heart the Montana inquiry is about tribal interests and tribal self government. See generally Hicks, 533 U.S. 353. The Tribe's interest in regulating commercial transactions between its members and nonmembers does not disappear just because a corporation is also a party to those transactions. That the Tribe was actively involved in facilitating negotiations between the Longs and the bank confirms that the Tribe had its own interest in facilitating the commercial endeavors of its members and in ensuring that they are not unfairly dispossessed of reservation land.

The existence of a consensual relationship is not alone sufficient to support tribal jurisdiction. See Strate, 520 U.S. at 457. The tribal exercise of authority must also take the form of taxation, licensing, or "other means" of regulating the activities of the nonmember, Montana, 450 U.S. at 565, and this regulation must have some nexus to the consensual relationship. Atkinson Trading Co. v. Shirley, 532 U.S. 645, 656 (2001). In other words, a nonmember's consensual relationship in one area "does not trigger tribal civil authority in another." Id.

The Supreme Court applied this limiting principle in the context of tort law in Strate v. A-1 Contractors, 520 U.S. 438 (1997). In Strate, a nonmember brought a lawsuit in tribal court against another nonmember for injuries sustained in an accident on a state highway within an Indian reservation. Although the defendant in that action had a consensual relationship with the Three Affiliated Tribes as a result of his work

---

[6]By this point the bank had another quite basic tie to the reservation since it had become the owner of the Long's former land on the reservation.

-11-

as a subcontractor for them, the lawsuit had not arisen within the context of that relationship. Rather, it arose out of a purely accidental encounter between two strangers. Because the tort was "distinctly non-tribal in nature," id. at 457, the tribes' interest in regulating the conduct was correspondingly attenuated, see id. at 459. Notably, the Court did not hold that tort law could never be an appropriate means for tribes to regulate nonmember conduct, but rather that there was no connection between the personal injury claim and the defendant's consensual relationship with tribal entities. See id. at 457.

In contrast, the Longs' discrimination claim arose directly from their preexisting commercial relationship with the bank. While the personal injury tort at issue in Strate defined the duties of one stranger to another, the tribal tort in this case provided a standard of conduct to govern the bank's preexisting relationship with the Longs. Moreover, the legal obligation to refrain from discriminating on the basis of tribal affiliation is decidedly more "tribal" than the basic personal injury law applicable in Strate. Unlike Strate, this case is not about a tribe's power to govern nonmembers "just because they enter the tribe's territory." See A-1 Contractors v. Strate, 76 F.3d 930, 941 (8th Cir. 1996) (characterizing central issue), aff'd, 520 U.S. 438. Rather, this case is about the power of the Tribe to hold nonmembers like the bank to a minimum standard of fairness when they voluntarily deal with tribal members.

In this respect we find the present situation more closely akin to the regulation upheld in Buster v. Wright, 135 F. 947 (8th Cir. 1905), a case cited by the Court in Montana as an illustration of the consensual relationship exception. See 450 U.S. at 566; see also Strate, 520 U.S. at 457. In Buster, this court upheld a permit tax on nonmembers for the privilege of conducting business with members on the reservation. After likening the permit tax to a license, we concluded that the regulation was permissible because the tribe had inherent authority to "prescribe the terms upon which noncitizens may transact business within its borders." 135 F. at 950.

Here, the Tribe was doing just that and exercising its inherent authority. By subjecting the bank to liability for violating tribal antidiscrimination law in the course of its business dealings with the Longs, the Tribe was setting limits on how nonmembers may engage in commercial transactions with members inside the reservation. The fact that we are dealing with the common law of torts rather than a licensing requirement or other statutory provision makes no substantive difference here. Tort law is after all both a means of regulating conduct, see, e.g., W. Page Keeton, et al., Prosser and Keeton on Torts 25 (5th ed. 1984) (Prosser), and an important aspect of tribal governance. See Smith, 434 F.3d at 1140. As the Supreme Court indicated in Curtis v. Loether, 415 U.S. 189 (1974), the distinction between statutory and common law rights may be functionally irrelevant in the context of intentional discrimination. Id. at 195 (discrimination claim for damages under the Civil Rights Act sounds in tort for purpose of Seventh Amendment). We see no reason why a tribal tort cannot be applied against a nonmember in that narrow set of circumstances where the consensual relationship exception is otherwise completely satisfied.

We therefore conclude that under Montana, the Tribe had inherent authority to regulate the bank's conduct arising out of its consensual relationship with the Longs by subjecting it to liability for tortious discrimination.[7]

The bank argues that the Montana test is not dispositive of jurisdiction in this case because even if the tribal courts *would have had* authority under Montana to adjudicate a tribal law claim against it, they did not actually hear such a case. It contends that the Longs' discrimination claim is more properly characterized as a

_____

[7]Because we conclude that the case falls within the first Montana exception, we need not address the Longs' additional argument that tribal jurisdiction would also be appropriate under the second exception (on the ground that the bank's conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe"). 450 U.S. at 566.

federal claim under 42 U.S.C. § 2000d. The bank also contends that the Supreme Court's decision in Hicks, 533 U.S. 353, precludes the tribal courts from exercising jurisdiction over a federal claim even if it falls within one of the Montana exceptions. The Longs respond that Hicks is not implicated here because their claim arose under tribal rather than federal law. They also add that even if they had raised a federal claim, the holding in Hicks was sufficiently narrow that it would not bar jurisdiction in this case.

In Hicks, the Supreme Court held that tribal courts had no jurisdiction to hear a § 1983 claim brought by a tribal member against state officers who had entered onto tribal land to execute a search warrant. Id. at 374. The bank argues that Hicks implicitly foreclosed tribal jurisdiction over other federal claims as well, including the Longs' claim which it now characterizes as arising under § 2000d. In contrast to the present case, however, the exercise of jurisdiction in Hicks did not fall within either Montana exception. Id. at 359 n.3, 364. The Supreme Court has never addressed whether tribal courts would be barred from hearing federal claims even when they would otherwise have jurisdiction under Montana, and we need not address this open question in this case.

We conclude that the tribal court of appeals appropriately upheld jurisdiction on the basis of tribal rather than federal law. Although the tribal trial court offered a post hoc federal basis for upholding the jury's verdict on the Longs' discrimination claim and even asserted it had authority to enforce federal law against nonmembers, a mistaken jurisdictional analysis in the trial court cannot override the Longs' pleadings and the decision of the tribal court of appeals. Moreover, even though the tribal court looked to federal law for guidance in upholding the verdict,[8] this would not necessarily mean that it regarded the cause of action as arising under federal law. Tribal law often draws upon an array of sources, from customary law to treaties, and

---

[8]The trial court noted that the "Cheyenne River Sioux Tribal Code directs this Court to apply federal law in the absence of applicable tribal law."

-14-

the Cheyenne River Sioux are "free to borrow from the law of other tribes, states, and the federal government." F. Cohen, Handbook of Federal Indian Law 274 (2005).

The existence of subject matter jurisdiction has traditionally depended on how a claim was pled, not on how the claim was perceived by the trial court. See, e.g., The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master to decide what law he will rely upon."); Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987) (as "master of the claim," plaintiff may "avoid federal jurisdiction by exclusive reliance on state law"). There is no indication that the Longs pled a federal cause of action, and the fact that the Longs *could have* pled a federal action is immaterial. The Longs' complaint alleged that the bank had engaged in "unequal treatment and unfair discrimination" when it granted more favorable terms to non Indian purchasers than to the Longs, making no mention of federal law or the elements of a particular federal claim. Cf. Wardle v. Nw. Inv. Co., 830 F.2d 118, 121-122 (8th Cir. 1987) (failure to allege specific elements of Little Tucker Act claim "strongly suggests" that no such claim was pled).

The bank's argument places undue emphasis on the trial court's jurisdictional analysis and gives too little regard to the decision of the tribal court of appeals. The Supreme Court has made it clear that until tribal appellate courts have had the "opportunity to review the determinations of the lower tribal courts" and to "rectify any errors," tribal evaluation of its own jurisdiction is not complete. Iowa Mut., 480 U.S. at 16-17, quoting Nat'l Farmers, 471 U.S. at 857 (1985).

Under the exhaustion doctrine first enunciated in National Farmers, 471 U.S. 845, federal courts will not review a tribe's jurisdiction until the tribal appellate review is complete. Iowa Mut., 480 U.S. at 17. The exhaustion requirement gives tribal courts the opportunity "to explain to the parties the precise basis for accepting jurisdiction" and to "provide other courts with the benefit of their expertise in such matters in the event of further judicial review." Nat'l Farmers, 471 U.S. at 857. Exhaustion would be a meaningless exercise if federal courts were to ignore the

determinations of the tribal appellate court. Here, the tribal court of appeals corrected the trial court's erroneous assumption that because the tribal code itself did not create a cause of action for discrimination, the only source of jurisdiction would be its authority to adjudicate federal law. "Proper respect for tribal legal institutions," Iowa Mut., 480 U.S. at 16, requires that we not overlook the appellate court's analysis as the bank would have us do. Since the tribal court of appeals upheld jurisdiction over a tribal rather than federal law claim and since the Longs' claim was not pled as a federal cause of action, we need not consider whether the tribal court would have had jurisdiction over a federal civil rights claim.

We conclude that the Montana inquiry is dispositive of tribal court jurisdiction over the Longs' tribal law discrimination claim. See Hicks, 533 U.S. at 358 n.2 (limiting holding to its facts). The Tribe had inherent authority to regulate the bank's activities in connection with its consensual business relationship with the Longs and their company. As a natural corollary, the tribal court system – the institution "best qualified to interpret and apply tribal law," Iowa Mut., 480 U.S. at 16 – also had jurisdiction to entertain tribal law disputes arising out of those activities.[9] See Strate, 520 U.S. at 453 (discussing presumption of coextensive adjudicative jurisdiction); see also Martinez, 436 U.S. at 65 (recognizing tribal courts as appropriate fora for adjudicating disputes involving interests of both Indians and non Indians). The tribal court therefore properly exercised jurisdiction over the Longs' discrimination claim.

III.

The bank next argues that the tribal judgment is not entitled to recognition because it was obtained in violation of due process. It objects to the decision by the

---

[9]Any distinction between regulatory and adjudicative jurisdiction would be artificial here, since the tribal courts acted in both a regulatory and adjudicatory capacity when they determined the respective rights and duties of the parties. See Strate, 76 F.3d at 938.

tribal court of appeals to uphold the jury's discrimination verdict on the basis of tribal tort law, arguing that the appellate court should have been constrained to address it under the federal law mentioned by the trial judge. The bank contends that it did not have proper notice that it was facing a tribal rather than a federal claim for discrimination and therefore was denied an adequate opportunity to defend itself against the claim. Finally, the bank suggests that it should not have been subject to liability for a tort that had not previously been recognized.

The Longs respond that the bank had adequate notice because their complaint was pled as a tribal law claim, the same basis upon which it was ultimately upheld. The Longs also point out that appellate courts may and often do affirm judgments on alternate grounds so long as doing so does not cause unfairness to the litigants. There was no unfairness here they say, because the bank had a full opportunity to develop the record on all elements of the tort and these elements did not materially differ from those included in the jury instructions or verdict form. The Tribe as amicus also urges this court not to second guess the authority or competency of its court system to articulate the evolving principles of tribal common law.

As an initial matter we note that the bank's due process claim is quite distinct from a traditional due process challenge. That is because the Bill of Rights and the Fourteenth Amendment do not of their own force constrain the authority of tribes or tribal courts.[10]  See Martinez, 436 U.S. at 56. Tribes are obliged to comply with the Indian Civil Rights Act (ICRA), 25 U.S.C. §§ 1301-1303, which contains analogous due process protections. The bank did not raise a claim under the ICRA, and even if

_____

[10]We have jurisdiction over the bank's due process claim whether or not it arises under 28 U.S.C. § 1331 because it is part of the same case or controversy, see 28 U.S.C. § 1367(a), as the bank's challenge to tribal jurisdiction which arises under federal law.  See Nat'l Farmers, 471 U.S. at 852-53; see also Alternate Fuels, Inc. v. Cabanas, 435 F.3d 855, 857 n.2 (8th Cir. 2006).

-17-

it had, that statute created no private cause of action for declaratory relief in federal court.  See Martinez, 436 U.S. at 72.

The bank maintains, however, that under principles of comity a tribal judgment should not be recognized in federal court if the tribal proceedings violated due process of law.  Comity refers to the recognition that one court affords to the decision of another "not as a matter of obligation, but out of deference and respect."  Black's Law Dictionary 242 (5th ed. 1979).  For support the bank cites the Ninth Circuit decision in Wilson v. Marchington, 127 F.3d 805 (9th Cir. 1997), which concluded that a federal court should recognize tribal judgments under principles of comity similar to those which govern recognition of foreign judgments.  Id. at 810; see also, e.g., Burrell v. Armijo, 456 F.3d 1159 (10th Cir. 2006); Mexican v. Circle Bear, 370 N.W.2d 737 (S.D. 1985).  Using an analogy to Hilton v. Guyot, 159 U.S. 113 (1895), the leading case on federal recognition of foreign judgments, the Ninth Circuit concluded that a tribal court judgment should not be recognized if it was obtained in violation of basic due process rights.  Marchington, 127 F.3d at 810.  It reasoned that in the context of comity, due process requires that a defendant be given the opportunity for a "full and fair trial before an impartial tribunal that conducts the trial upon regular proceedings after proper service or voluntary appearance of the defendant, and that there is no showing of prejudice in the tribal court or in the system of governing laws."  Id. at 811.

This court has not had occasion to consider whether to borrow principles for recognition of foreign judgments in considering recognition of tribal judgments, and we need not do so in this case.  Since we conclude on the basis of this record that the tribal proceedings violated no basic tenet of due process, we need not discuss the test articulated in Marchington.

As the Longs point out, it is not uncommon for this court to uphold a judgment on grounds not decided or discussed in the district court so long as those grounds are supported by the record. See, e.g., United States v. Sager, 743 F.2d 1261, 1263 n.4

-18-

(8th Cir. 1984). A tribe is neither required nor expected to use the same judicial procedures employed by federal courts, however, and federal courts must take care not to exercise "unnecessary judicial paternalism in derogation of tribal self-governance." Marchington, 127 F.3d at 811; see also Kremer v. Chem. Constr. Corp., 456 U.S. 461, 483 (1982) (due process dictates "no single model of procedural fairness, let alone a particular form of procedure"). The rules that this circuit has developed for departing from the reasoning of a lower court reflect our own balancing of considerations like judicial economy and the interests of both parties. Cf. Singleton v. Wulff, 428 U.S. 106, 121 (1976) (decision is primarily matter of discretion for appellate court). The tribal court of appeals is free to strike a different balance between those considerations so long as its procedures do not deny defendants adequate notice and fair opportunity to defend themselves. See Hilton, 159 U.S. at 167, 205.

In this case there was no deficiency in notice or opportunity to defend sufficient to make out a due process violation. The Longs never asserted a violation of federal law, the bank made no attempt to dismiss the discrimination claim for vagueness, and no reference to federal law was made to the jury.[11] The bank has also not shown that it suffered prejudice as a result of having tailored its defense to a federal rather than tribal claim. The fighting issue in the trial court was whether the bank denied the Longs favorable terms on a deal solely on the basis of their race or tribal affiliation. The bank had ample opportunity to present evidence that it did not give the Longs less favorable terms than its non Indian customers or that it did so for some other permissible reason. We discern no difference between the tribal tort of discrimination as recognized by the tribal court of appeals and the claim as it was presented to the

_____

[11]If the bank was convinced that it was defending against a federal claim over which the tribal court had no jurisdiction, it could have gone immediately to federal court to seek a declaratory judgment that the tribal courts lacked authority to hear the case. See Hicks, 533 U.S. at 369, 374 (holding exhaustion requirement inapplicable where jurisdiction clearly lacking).

jury. The bank was therefore not denied a fair opportunity to present relevant evidence or to defend itself.

The bank also argues that it should not have been subject to liability under a tort that had not previously been recognized by the tribal court of appeals. That the Longs' discrimination claim was novel is not itself grounds for refusing comity to the subsequent judgment where there is no indication that the court otherwise acted out of bias or refused to follow its own law. See Prosser, supra, at 4(novelty of claim not itself a bar to recovery). Tort law has historically developed incrementally in the courts. See id. at 3 ("[T]he progress of the common law is marked by many cases of first impression, in which the court has struck out boldly to create a new cause of action, where none had been recognized before."). If the encouragement of tribal self governance through the development of legal institutions is to remain a federal priority, see, e.g., Iowa Mut., 480 U.S. at 16-17, then tribal appellate courts must be given latitude to shape their own common law to respond to the cases before them, as our own courts have done over the centuries.

The bank has also suggested that as a non Indian company it could not obtain a fair hearing in tribal court on a claim that it discriminated against Indians, but there is simply no evidence to support this assertion. If the bank feared prejudice from an all Indian jury, it could have requested that the tribal court exercise the discretion granted to it by the tribal code to summon non Indians to serve on the jury. It made no such request, but instead proceeded to trial without striking any jurors or challenging the composition of the panel. Absent some indication that the tribal courts were biased or subject to political control, we must presume the court system to be competent and impartial. Duncan Energy, 27 F.3d at 1301. The bank has failed to show any bias in this case.

Since the bank has failed to show that it was denied a full and fair opportunity to be heard in tribal court, we see no reason on this record to deny comity to the Longs' tribal judgment.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____