Justice Ginsburg, with whom Justice Stevens, Justice Souter, and Justice Breyer
join, concurring in part, concurring in the judgment in part, and dissenting in part.
I agree with the Court that petitioner Plains Commerce Bank (Bank) has Article III standing to contest the jurisdiction of the Cheyenne River Sioux Tribal Court, and therefore join Part II of the Court’s opinion. Further, I take no issue with the Court’s jurisdictional ruling insofar as it relates to the Tribal Court’s supplemental judgment. In that judgment, the Tribal Court ordered the Bank to give Ronnie and Lila Long an option to repurchase fee land the Bank had already contracted to sell to non-Indian individuals. See App. to Pet. for Cert. A-69 to A-71.
I dissent from the Court’s decision, however, to the extent that it overturns the Tribal Court’s principal judgment awarding the Longs damages in the amount of $750,000 plus interest. See App. 194-196. That judgment did not disturb the Bank’s sale of fee land to non-Indians. It simply *343 responded to the claim that the Bank, in its on-reservation commercial dealings with the Longs, treated them disadvantageously because of their tribal affiliation and racial identity. A claim of that genre, I would hold, is one the Tribal Court is competent to adjudicate. As the Court of Appeals correctly understood, the Longs’ case, at heart, is not about “the sale of fee land on a tribal reservation by a non-Indian bank to non-Indian individuals,” ante, at 320. “Rather, this case is about the power of the Tribe to hold nonmembers like the bank to a minimum standard of fairness when they voluntarily deal with tribal members.” 491 F. 3d 878, 887 (CA8 2007) (case below).
As the basis for their discrimination claim, the Longs essentially asserted that the Bank offered them terms and conditions on land-financing transactions less favorable than the terms and conditions offered to non-Indians. Although the Tribal Court could not reinstate the Longs as owners of the ranch lands that had been in their family for decades, that court could hold the Bank answerable in damages, the law’s traditional remedy for the tortious injury the Longs experienced.
I
In the pathmarking case, Montana v. United States, 450 U. S. 544, 564-565 (1981), this Court restated that, absent a treaty or statute, Indian tribes generally lack authority to regulate the activities of nonmembers. While stating the general rule, Montana also identified two exceptions:
“A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the politi *344 cal integrity, the economic security, or the health or welfare of the tribe.” Id., at 565-566 (citations omitted).
These two exceptions, Montana explained, recognize that “Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.” Id., at 565 (emphasis added).
Montana specifically addressed the regulatory jurisdiction of tribes. See id., at 557. This Court has since clarified that when a tribe has authority to regulate the activity of nonmembers, tribal courts presumably have adjudicatory authority over disputes arising out of that activity. See Strate v. A-1 Contractors, 520 U. S. 438, 453 (1997) (as to nonmembers, a tribe’s adjudicative jurisdiction coincides with its legislative jurisdiction). In my view, this is a clear case for application of Montana’s first or “consensual relationships” exception. I therefore do not reach the Longs’ alternative argument that their complaint also fits within Montana’s second exception.
Ronnie and Lila Long, husband and wife and owners of the Long Family Land and Cattle Company (Long Company), are enrolled members of the Cheyenne River Sioux Tribe. Although the Long Company was incorporated in South Dakota, the enterprise “was overwhelmingly tribal in character, as were its interactions with the bank.” 491 F. 3d, at 886. All Long Company property was situated—and all operations of the enterprise occurred — within the Cheyenne River Sioux Indian Reservation. The Long Company’s articles of incorporation required Indian ownership of a majority of the corporation’s shares. This requirement reflected the Long Company’s status as an Indian-owned business entity eligible for Bureau of Indian Affairs (BIA) loan guarantees. See 25 CFR § 103.25 (2007) (requiring at least 51% Indian ownership). Loan guarantees are among the incentives the BIA offers to promote the development of on-reservation In *345 dian enterprises. The Long Company “was formed to take advantage of [the] BIA incentives.” 491 F. 3d, at 886.
The history of the Bank’s commercial dealings with the Long Company and the Long family is lengthy and complex. The business relationship dates from 1988, when Ronnie Long’s parents—one of them a member of the Tribe—mortgaged some 2,230 acres of land to the Bank to gain working capital for the ranch. As security for the Bank’s loans over the years, the Longs mortgaged both their land and their personal property. The Bank benefited significantly from the Long Company’s status as an Indian-owned business entity, for the BIA loan guarantees “allowed [it] to greatly reduce its lending risk.” Ibid. Eventually, the Bank collected from the BIA almost $400,000, more than 80% of the net losses resulting from its loans to the Longs. See 440 F. Supp. 2d 1070, 1078 (SD 2006) (case below); App. 135-138.
The discrimination claim here at issue rests on the allegedly unfair conditions the Bank exacted from the Longs when they sought loans to sustain the operation of their ranch. Following the death of Ronnie’s father, the Bank and the Longs entered into an agreement under which the mortgaged land would be deeded over to the Bank in exchange for the Bank’s canceling some debt and making additional loans to keep the ranch in business. The Longs were given a two-year lease on the property with an option to buy the land back when the lease term expired. Negotiating sessions for these arrangements were held at the Tribe’s on-reservation offices and were facilitated by tribal officers and BIA employees. 491 F. 3d, at 881.
Viewing the deal they were given in comparative light, the Longs charged that the Bank offered to resell ranch land to them on terms less advantageous than those the Bank offered in similar dealings with non-Indians. Their claim, all courts prior to this one found, fit within the Montana exception for “activities of nonmembers who enter [into] . . . commercial dealing, contracts, leases, or other arrangements” *346 with tribal members. 450 U. S., at 565. Cf. Strate, 520 U. S., at 457 (Montana's consensual-relationships exception justifies tribal-court adjudication of claims “arising out of on-reservation sales transaction between nonmember plaintiff and member defendants” (citing Williams v. Lee, 358 U. S. 217, 223 (1959))). I am convinced that the courts below got it right.
This case, it bears emphasis, involves no unwitting outsider forced to litigate under unfamiliar rules and procedures in tribal court. Cf. Nevada v. Hicks, 533 U. S. 353, 382-385 (2001) (Souter, J., concurring). Hardly a stranger to the tribal court system, the Bank regularly filed suit in that forum. See Brief for Cheyenne River Sioux Tribe as Amicus Curiae 29-31. The Bank enlisted tribal-court aid to serve notice to quit on the Longs in connection with state-court eviction proceedings. The Bank later filed a counterclaim for eviction and motion for summary judgment in the case the Longs commenced in the Tribal Court. In its summary judgment motion, the Bank stated, without qualification, that the Tribal Court “ha[d] jurisdiction over the subject matter of this action.” App. 187-188. Had the Bank wanted to avoid responding in tribal court or the application of tribal law, the means were readily at hand: The Bank could have included forum selection, choice-of-law, or arbitration clauses in its agreements with the Longs, which the Bank drafted. See Brief for Respondents 42.
II
Resolving this case on a ground neither argued nor addressed below, the Court holds that a tribe may not impose any regulation—not even a nondiscrimination requirement— on a bank’s dealings with tribal members regarding on-reservation fee lands. See ante, at 320, 340. I do not read Montana or any other case so to instruct, and find the Court’s position perplexing.
*347 First, I question the Court’s separation of land sales tied to lending activities from other “activities of nonmembers who enter consensual relationships with the tribe or its members,” Montana, 450 U. S., at 565. Sales of land — and related conduct—are surely “activities” within the ordinary sense of the word. See, e. g., County of Yakima v. Confederated Tribes and Bands of Yakima Nation, 502 U. S. 251, 269 (1992) (“The excise tax remains a tax upon the Indian’s activity of selling the land . . . .” (emphasis added)). Cf. 14 Oxford English Dictionary 388 (2d ed. 1989) (defining “sale” as “[t]he action or an act of selling” (def. 1(a))).
Second, the Court notes the absence of any case “f[i]nd[ing] that Montana authorized a tribe to regulate the sale of [non-Indian fee] land.” Ante, at 334. But neither have we held that Montana prohibits all such regulation. If the Court in Montana, or later cases, had intended to remove land sales resulting from loan transactions entirely from tribal governance, it could have spoken plainly to that effect. Instead, Montana listed as examples of consensual relationships that tribes might have authority to regulate “commercial dealing, contracts, [and] leases.” 450 U. S., at 565. Presumably, the. reference to “leases” includes leases of fee land. But why should a nonmember’s lease of fee land to a member be differentiated, for Montana exception purposes, from a sale of the same land? And why would the enforcement of an antidiscrimination command be less important to tribal self-rule and dignity, cf. ante, at 334-337, when the command relates to land sales than when it relates to other commercial relationships between nonmembers and members?
Ill
As earlier observed, see supra, at 342, I agree that the Tribal Court had no authority to grant the Longs an option to purchase the 960-acre parcel the Bank had contracted to sell to individuals unaffiliated with the Tribe. The third *348 parties’ contracts with the Bank cannot be disturbed based on Montana’s exception for “the activities of nonmembers who enter consensual relationships with the tribe or its members.” 450 U. S., at 565. Although the Tribal Court overstepped in its supplemental judgment ordering the Bank to give the Longs an option to purchase land third parties had contracted to buy, see App. to Pet. for Cert. A-69 to A-71, it scarcely follows that the Tribal Court lacked jurisdiction to adjudicate the Longs’ discrimination claim, and to order in its principal judgment, see App. 194-196, monetary relief.[1]
The Court recognizes that “[t]he Bank may reasonably have anticipated that its various commercial dealings with the Longs could trigger tribal authority to regulate those transactions.” Ante, at 338. Today’s decision, furthermore, purports to leave the Longs’ breach-of-eontract and bad-faith claims untouched. Ante, at 339, n. 2. Noting that the Bank “does not presently challenge the breach-of-contract verdict,” ante, at 324, the Court emphasizes that “[o]nly the discrimination claim is before us and that claim is tied specifically to the sale of the fee land,” ante, at 339. But if the Tribal Court is a proper forum for the Longs’ claim that the Bank has broken its promise or acted deceptively in the land-financing transactions at issue, one is hard put to understand why the Tribe could not likewise enforce in its courts a law that commands: Thou shall not discriminate against tribal members in the terms and conditions you offer them in those same transactions. The Federal Government *349 and every State, county, and municipality can make nondiscrimination the law governing contracts generally, and real property transactions in particular. See, e. g., 42 U. S. C. §§ 1981, 1982. Why should the Tribe lack comparable authority to shield its members against discrimination by those engaging in on-reservation commercial relationships — including land-secured lending—with them?
A
The “fighting issue” in the tribal trial court, the Eighth Circuit underscored, “was whether the bank denied the Longs favorable terms on a deal solely on the basis of their race or tribal affiliation.” 491 F. 3d, at 891. The Longs maintained that the Bank initially offered them more favorable terms, proposing to sell the mortgaged land back to them with a 20-year contract for deed. Thereafter, the Bank sent a letter to Ronnie Long withdrawing its initial offer, “citing ‘possible jurisdictional problems’ posed by the Long Company’s status as an ‘Indian owned entity on the reservation.’” Id., at 882 (quoting Letter from Charles Simon, Vice President, Bank of Hoven, to Ronnie Long (Apr. 26, 1996), App. 91). In the final agreement, the Bank promised no long-term financing; instead, it gave the Longs only a two-year lease with an option to purchase that required a large balloon payment within 60 days of the lease’s expiration. When the Longs were unable to make the required payment within the specified deadline, the Bank sold the land to nonmembers on more favorable terms.
In their complaint, the Longs alleged that the Bank allowed the non-Indians “ten years to pay for the land, but the bank would not permit [the] Longs even 60 days to pay for their land,” and that “[s]uch unfair discrimination by the bank prevented the Longs and the [Long] Company from buying back their land from the bank.” App. 173. Although the allegations about the Bank’s contracts to sell to nonmembers were central to the Longs’ lawsuit, those trans *350 actions with third parties were not the wrong about which the Longs complained. Rather, as the tribal trial court observed, the contracts with nonmembers simply supplied “evidence that the Bank denied the Longs the privilege of contracting for a deed because of their status as tribal members.” App. to Pet. for Cert. A-78 to A-79 (emphasis added).
The Tribal Court instructed the jury to hold the Bank liable on the discrimination claim only if the less favorable terms given to the Longs rested “solely” upon the Longs’ “race or tribal identity.” 491 F. 3d, at 883 (internal quotation marks omitted). In response to a special interrogatory, the jury found that “the Defendant Bank intentionally discriminate[d] against the Plaintiffs Ronnie and Lila Long [in the lease with option to purchase] based solely upon their status as Indians or tribal members.” App. 191. Neither the instruction nor the special finding necessitated regulation of, or interference with, the Bank’s fee-land sales to non-Indian individuals. See ante, at 320.[2]
Tellingly, the Bank’s principal jurisdictional argument below bore no relationship to the position the Court embraces. The Bank recognized that the Longs were indeed complaining about discriminatory conduct of a familiar sort. Cf. Jones v. Alfred H. Mayer Co., 392 U. S. 409, 413 (1968) *351 (42 U. S. C. § 1982 “bars all racial discrimination ... in the sale or rental of property”). In Hicks, 533 U. S. 353, this Court held that tribal courts could not exercise jurisdiction over a claim arising under federal law, in that case, 42 U. S. C. § 1983. Relying on Hicks, the Bank insisted that the Longs’ discrimination claim could not be heard in tribal court because it arose under well-known federal antidiscrimination law, specifically, 42 U. S. C. § 1981 or § 2000d. 491 F. 3d, at 882-883. The Tribal Court of Appeals, however, held that the claim arose under Lakota common law, which resembled federal and state antidiscrimination measures. See App. to Pet. for Cert. A-54 to A-55, and n. 5.[3]
B
The Longs requested a remedy the Tribal Court did not have authority to grant — namely, an option to repurchase land the Bank had already contracted to sell to nonmember third parties. See supra, at 347-348. That limitation, however, does not affect the court’s jurisdiction to hear the Longs’ discrimination claim and to award damages on that claim. “The nature of the relief available after jurisdiction attaches is, of course, different from the question whether *352 there is jurisdiction to adjudicate the controversy.” Avco Corp. v. Machinists, 390 U. S. 557, 561 (1968). See also Davis v. Passman, 442 U. S. 228, 239-240, n. 18 (1979) C‘[J]urisdiction is a question of whether a federal court has the power ... to hear a case”; “relief is a question of the various remedies a federal court may make available.”).
Under the procedural rules applicable in Cheyenne River Sioux Tribal Courts, as under the Federal Rules, demand for one form of relief does not confine a trial court’s remedial authority. See Law and Order Code of Cheyenne River Sioux Tribe, Rule Civ. Proc. 25(c)(1) (“[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if such relief is not demanded in the pleadings.”); Fed. Rule Civ. Proc. 54(c) (materially identical). A court does not lose jurisdiction over a claim merely because it lacks authority to provide the form of relief a party primarily demands. See Avco, 390 U. S., at 560-561; 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2664, pp. 181-182 (3d ed. 1998) (“[I]t is not . . . the type of relief requested in the demand that determines whether the court has jurisdiction.”).[4] In such a case, authority to provide another remedy suffices to permit the court to adjudicate the merits of the claim. See Avco, 390 U. S., at 560-561.
* * *
For the reasons stated, I would leave undisturbed the Tribal Court’s initial judgment, see App. 194-196, awarding the Longs damages, prejudgment interest, and costs as redress for the Bank’s breach of contract, bad faith, and discrimination. Accordingly, I would affirm in large part the judgment of the Court of Appeals.

 The Longs joined their discrimination claim with claims of breach of contract and bad-faith dealings. The jury found in favor of the Longs on all three claims. App. 190-192. The latter claims alleged that the Bank “never provided the . . . operating loans” promised during the parties’ negotiations. 491 F. 3d 878, 882 (CA8 2007). “[A]s a result,” the Longs asserted, “the company was not able [to] sustain its ranching operation through the particularly harsh winter of 1996-97.” Ibid. Nothing in the Court’s opinion precludes decision of those claims by the Tribal Court. See ante, at 325, 326-327, 339, n. 2.

 The Court criticizes the Tribal Court for “requirpng] the Bank to offer the same terms of sale to a prospective buyer who had defaulted in several previous transactions with the Bank as it offered to a different buyer without such a history of default.” Ante, at 338. That criticism is unfair. First, the record does not confirm that the Longs were riskier buyers than the nonmembers to whom the Bank eventually sold the land. Overlooked by the Court, the Bank’s loans to the Longs were sheltered by BIA loan guarantees. See supra, at 344-345. Further, a determination that the Longs had encountered intentional discrimination based solely on their status as tribal members in no way inhibited the Bank from differentiating evenhandedly among borrowers based on their creditworthiness. The proscription of discrimination simply required the Bank to offer the Longs the same terms it would have offered similarly situated non-Indians.

 The Court types the Longs’ discrimination claim as “‘novel,’” ante, at 338 (quoting 491 F. 3d, at 892), because the Tribal Court of Appeals derived the applicable law ‘“directly from Lakota tradition,’ ” ante, at 338 (quoting 440 F. Supp. 2d 1070, 1082 (SD 2006) (case below)). Concerning the content of the Tribe’s law, however, the appeals court drew not only from “Tribal tradition and custom,” it also looked to federal and state law. See App. to Pet. for Cert. A-55. Just as state courts may draw upon federal law when appropriate, see, e. g., Dawson v. Birenbaum, 968 S. W. 2d 663, 666-667 (Ky. 1998), and federal courts may look to state law to fill gaps, see, e. g., United States v. Kimbell Foods, Inc., 440 U. S. 715, 728-730 (1979), so too may tribal courts “borrow from the law of. . . the federal government,” see F. Cohen, Handbook of Federal Indian Law §4.05[1], p. 275 (2005 ed.). With regard to checks against discrimination, as the Tribal Court of Appeals observed, “there is a direct and laudable convergence of federal, state, and tribal concern.” App. to Pet. for Cert. A-55 to A-56.

 As in this case, see App. 177-179, the complaint in Avco sought injunctive relief, but also included a residual clause asking for other relief, see Avco Corp. v. Aero Lodge No. 735, Int’l Assn, of Mach, and Aerospace Workers, 376 F. 2d 337, 339 (CA6 1967).